JAMES G. NORMAN, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Norman v. Commissioner
Docket Nos. 7361-77, 7362-77, 8398-77, 8399-77, 9052-77, 9053-77, 9330-78, 6462-79, 6463-79, 6464-79, 6465-79, 6466-79, 9392-79.
United States Tax Court
T.C. Memo 1987-265; 1987 Tax Ct. Memo LEXIS 265; 53 T.C.M. (CCH) 905; T.C.M. (RIA) 87265; May 27, 1987. *265 Respondent made a series of determinations with respect to real estate transactions that were engaged in by petitioner A and various partnerships and corporations that he controlled. Held:
(1) the income from the sales of ownership interests in apartment building FW during 1973 and 1974 is attributable to petitioner-corporation AVL; (2) the income from the sales of ownership interests in apartment building CC during 1973 and 1974 is attributable to partnership WY; (3) the income from the sales of ownership interests in apartment building WA during 1975 is attributable to corporation WI; (4) petitioner A received from petitioner-corporation AVL in 1973 a constructive distribution of property with a fair market value of $396,000; (5) petitioner A received from corporation WI in 1974 a constructive distribution of property with a fair market value of $200,000; (6) partnership P was not the owner of apartment building PHRA during the years in question and therefore is not entitled to claim any losses with respect thereto; (7) petitioner A is not entitled to deduct a loss in 1973 from partnership S; (8) respondent properly disallowed losses claimed by partnership S in 1974 and 1975; (9) *266 corporation AR has additional income in 1975 resulting from its receipt of prepaid cash proceeds pursuant to long-term service contracts; (10) respondent properly disallowed a deduction taken in 1975 by petitioner-corporation REI for a claimed management and consulting expense; (11) corporation RDM is not entitled to an interest deduction in 1975 for interest accrued on a note payable to a related partnership; (12) corporation MMB is not entitled to a bad debt deduction in 1975; (13) corporation EFS is not entitled to claim a loss on the 1975 consolidated Federal income tax return of petitioner-corporation CWI that arose during a period prior to the affiliation of EFS with CWI; (14) corporation MMB has ordinary income in 1975 in the amount of $181,436 resulting from the loss recaptured upon the worthlessness of the stock of EFS; (15) petitioner-corporation CWI is liable for an addition to tax pursuant to sec. 6651(a)(1), I.R.C. 1954, for 1975; (16) petitioner-corporation CWI is liable for an addition to tax pursuant to sec. 6653(a), I.R.C. 1954, for 1975; (17) partnership CP has unreported note discount income for 1973 and 1974 as determined by respondent; (18) partnership CP has additional *267 income for 1974 from the sale of certain notes as determined by respondent; (19) principal payments on certain notes constitute income to partnership CP in 1973 and 1974 as determined by respondent; (20) partnership CP is not entitled to deduct a portion of a note discount expense claimed in 1974; (21) partnership CP improperly reported its note discount income for 1975 as determined by respondent; (22) petitioner A has unreported income for 1973 in the amount of $72,000; (23) petitioner A is not entitled to deduct a claimed syndication expense in 1973; (24) respondent properly disallowed a portion of a short-term capital loss claimed by petitioner A in 1973; (25) petitioner A has additional dividend income in 1974 and 1975 as determined by respondent; (26) petitioner A is not entitled to deduct a claimed loss from gold futures trading in 1975; (27) petitioner A is not entitled to deduct a transfer tax that was paid in connection with his purchase of a personal residence in 1974; (28) petitioner-corporation AVL is not entitled to deduct a claimed note discount expense in 1974; (29) petitioner-corporation AVL is not entitled to deduct a claimed debt reduction expense in 1974; (30) respondent *268 properly disallowed a deduction for an investment reserve expense claimed by corporation REI in 1974; (31) petitioner CB is not entitled to deduct $1,200 as a charitable contribution in 1975; (32) petitioner CB is liable for an addition to tax pursuant to sec. 6653(a), I.R.C. 1954, for 1974 and 1975; (33) petitioner-corporation LAV is liable for an addition to tax pursuant to sec. 6653(a), I.R.C. 1954, for 1974; (34) petitioner-corporation REI is liable for an addition to tax pursuant to sec. 6653(a), I.R.C. 1954, for 1975; and (35) petitioner A is liable for an addition to tax for fraud pursuant to sec. 6653(b), I.R.C. 1954, for 1973, 1974, and 1975. John H. MacVey, for the petitioners. Cynthia J. Mattson, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Chief Judge: These consolidated cases result from a series of determinations by respondent with respect to real estate transactions engaged in by petitioner Aleksandrs V. Laurins and various partnerships and corporations that he controlled. The tax years before the Court are 1973, 1974, and 1975. The specific petitioners, docket numbers, years, deficiencies, and additions to tax appear in Appendix *269 A attached hereto. At the outset, we must state that these cases have been particularly vexatious to the Court. Difficulties were encountered in getting the parties to stipulate evidence and in arriving at a trial date. Petitioners must bear most, and probably all, of the responsibility for these difficulties. The trial itself was lengthy by the standards of this Court. In addition, approximately 400 exhibits were introduced and 35 issues, not including alternative issues, were presented for our consideration. The issues are almost entirely factual in nature. One suspects that petitioners deliberately made the transactions as complex as possible to serve their own purposes. Understandably, respondent's opening brief was 357 pages long, containing detailed proposed findings of fact. Petitioners failed to make proposed findings of fact in the form prescribed by Rule 151(e)(3), [2] *270 and this oversight was clearly not helpful to their cause. In this opinion, we have done our best to straighten out what can only be described as a maze of massive proportions. Having said this, we turn our attention to the task at hand. After concessions by respondent, the issues for decision are (1) whether the income from the sales of ownership interests in an apartment building known as Fairfax West Apartments in 1973 and 1974 is attributable to petitioner A.V. Laurins & Co., Inc. (AVL); (2) whether the income from the sales of ownership interests in an apartment building known as the Chancellery Cooperative in 1973 and 1974 is attributable to a partnership known as Wyoming Associates; (3) whether the income from the sales of ownership interests in an apartment building known as Wisconsin Apartments in 1975 is attributable to a corporation known as Wisconsin Avenue Associates, Inc. (Wisconsin); (4) whether petitioner Aleksandrs V. Laurins (Aleksandrs) received from AVL in 1973 a constructive distribution of property with a fair market value of $396,000; (5) whether Aleksandrs received from Wisconsin in 1974 a constructive distribution of property with a fair market value of $200,000; (6) whether a partnership known as Pleasant Hill Associates *271 is entitled to claim losses from an apartment building known as the Pleasant Hill Road Apartments; (7) whether Aleksandrs is entitled to deduct a loss in 1973 from a partnership known as Sundown Associates (Sundown); (8) whether respondent properly disallowed certain losses claimed by Sundown in 1974 and 1975; (9) whether a subsidiary of petitioner Consolidated Western Investors, Inc. (CWI), known as Aries Information Systems, has additional income in 1975 as the result of receiving prepaid cash proceeds pursuant to long-term service contracts; (10) whether respondent properly disallowed a deduction taken in 1975 by petitioner Real Estate Equity Management, Inc. (Real Estate, Inc.), for a claimed management and consulting expense; (11) whether a subsidiary of CWI known as Real Development Management, Inc., is entitled to an interest deduction in 1975 for interest accrued on a note payable to a related partnership; (12) whether a subsidiary of CWI known as Metropolitan Mortgage Bankers, Inc. (MMB), is entitled to a bad debt deduction in the amount of $34,326.79 in 1975; (13) whether a subsidiary of CWI known as E.F. Shelley and Co., Inc. (EFS Company), is entitled to claim a loss on *272 the CWI 1975 consolidated Federal income tax return that arose during a period prior to EFS Company's affiliation with CWI; (14) whether MMB has ordinary income in 1975 in the amount of $181,436 resulting from a loss recaptured upon the worthlessness of EFS Company's stock; (15) whether CWI is liable for an addition to tax pursuant to section 6651(a)(1) for the taxable year 1975; (16) whether CWI is liable for an addition to tax for negligence pursuant to section 6653(a) for the taxable year 1975; (17) whether a partnership known as Co-op Mortgage Investment Associates (Co-op) has unreported note discount income in 1973 and 1974; (18) whether Co-op has additional income in 1974 from the sale of certain notes; (19) whether principal payments on certain notes constitute income to Co-op in 1973 and 1974; (20) whether Co-op is entitled to deduct a note discount expense in the amount of $6,351.74 in 1974; (21) whether Co-op improperly reported its note discount income in 1975; (22) whether Aleksandrs has unreported income in 1973 in the amount of $72,000; (23) whether Aleksandrs is entitled to deduct a claimed "syndication expense" in the amount of $37,221 in 1973; (24) whether respondent *273 properly disallowed $988 of a $1,988 short-term capital loss claimed by Aleksandrs in 1973; (25) whether Aleksandrs has dividend income in 1974 and 1975 in the amounts of $10,232 and $92, respectively; (26) whether Aleksandrs is entitled to deduct a $7,060 loss from gold futures trading in 1975; (27) whether Aleksandrs is entitled to deduct a transfer tax in the amount of $1,547 in 1974 that was paid in connection with his purchase of a personal residence; (28) whether AVL is entitled to deduct a claimed note discount expense in the amount of $6,365 in 1974; (29) whether AVL is entitled to deduct a claimed debt reduction expense in the amount of $20,339 in 1974; (30) whether Real Estate, Inc., is entitled to deduct a claimed investment reserve expense in the amount of $15,000 in 1974; (31) whether petitioner Charlene Baden (Charlene) is entitled to a charitable contributions deduction of $1,200 in 1975; (32) whether Charlene is liable for an addition to tax for negligence pursuant to section 6653(a) for the taxable years 1974 and 1975; (33) whether petitioner LAV Shell Co., Inc., is liable for an addition to tax for negligence pursuant to section 6653(a) for the taxable year 1974; *274 (34) whether Real Estate, Inc., is liable for an addition to tax for negligence pursuant to section 6653(a) for the taxable year 1975; and (35) whether Aleksandrs is liable for an addition to tax for fraud pursuant to section 6653(b) for the taxable years 1973, 1974, and 1975. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulations of facts and exhibits attached thereto are incorporated herein by this reference. Appendix B attached hereto lists the petitioners by name, the places of residence of the individual petitioners and the principal places of business of the corporate petitioners at the time they filed their petitions herein, and the offices of the Internal Revenue Service where the petitioners filed their Federal income tax returns for the years in question. I. Fairfax West
In late September of 1972, petitioner Aleksandrs V. Laurins (Aleksandrs) began negotiating with National Mortgage Corporation (NMC) for the purchase of Fairfax West Apartments (Fairfax West), a 72-unit apartment building located in Fairfax, Virginia. Aleksandrs' plan was to have petitioner A.V. Laurins & Company, Inc. (AVL), [3] a corporation that Aleksandrs formed in *275 1971, renovate the Fairfax West apartment units and sell them to the public at a profit. On October 30, 1972, Aleksandrs and AVL entered into an agreement (the nominee agreement) which provided that Aleksandrs would receive the income from the sale of Fairfax West to the Fairfax West Apartment Owners Association (FWAO), a non-profit, non-stock, homeowners' cooperative corporation that Aleksandrs formed in 1972 for the purpose of taking title to Fairfax West. [4] The nominee agreement further provided that AVL would "bear all costs to rent and sell the Mutual *276 Ownership Contracts and * * * [would] receive all income from rental and sales, which is attributable to the Mutual Ownership Contract." Also on October 30, 1972, AVL entered into a sales contract with NMC whereby NMC agreed to sell and AVL agreed to purchase Fairfax West. The sales contract provided that AVL would pay $40,000 in cash at the time of settlement, execute and deliver to NMC a promissory note for $60,000, and take title to the property subject to existing financing. On January 1, 1973, in anticipation of its acquisition of Fairfax West, FWAO employed AVL to manage its affairs and assigned to AVL for sale to the public the ownership interests in Fairfax West, which were represented by 72 mutual ownership contracts. [5] Also on January 1, 1973, FWAO executed a promissory note to AVL in the amount of $1,127,520 (the wrap note), which was secured by a deed of trust on Fairfax West (the third deed of trust). It was expected that each purchaser of a mutual ownership contract would execute a promissory note to FWAO in an amount equal to the purchaser's pro rata share of the wrap note, and the third *277 deed of trust required FWAO to assign these promissory notes to the holder of the wrap note. The third deed of trust also required the holder of the wrap note to make all payments on the first and second deeds of trust out of payments received on the wrap note. On January 2, 1973, instead of conveying Fairfax West to AVL as provided in the sales contract, NMC conveyed Fairfax West to FWAO for $40,000 in cash, a $60,000 promissory note secured by a deed of trust on Fairfax West (the second deed of trust), and subject to a first deed of trust with a principal balance of $591,748.05. The $40,000 in cash was obtained from Frances Novick (Novick), Aleksandrs' grandmother-in-law, pursuant to an agreement between AVL and Novick, which provided that Novick would invest $60,000 in the Fairfax West project and AVL would pay Novick $120,000 on or before November 2, 1973. Also, on January 2, 1973, AVL assigned the wrap note to Co-op Mortgage Investment Associates (Co-op), a limited partnership that was formed in 1971 for the purpose of investing in notes *278 secured by ownership interests in cooperative and condominium dwelling units. [6] In return, Co-op transferred to Aleksandrs 396 class A units of Co-op valued at $1,000 per unit. AVL began selling the Fairfax West mutual ownership contracts in October of 1973. It sold contracts for 44 apartment units in 1973 and 28 units in 1974. As AVL sold the mutual ownership contracts, downpayments of cash and small collateral personal notes were paid to AVL, and each purchaser executed a promissory note to FWAO in an amount equal to his or her pro rata share of the wrap note. These promissory notes were secured by the mutual ownership contracts and carried interest at the rate of 8.5 percent per annum. As FWAO received the promissory notes, it assigned them to Co-op, the owner of the wrap note. The payments received by FWAO on the promissory notes funded the payments to Co-op on the wrap note, and the total face value of the promissory notes equaled the *279 face value of the wrap note, $1,127,520. The proceeds from the sales of the mutual ownership contracts in 1973 and 1974 were as follows: 1973 (44 contracts/apartments)
Cash
$119,904.00
Collateral notes
52,350.00
44 promissory notes
$704,440.00
Total
[7] $876,700.00
1974 (28 contracts/apartments)
Cash
$ 65,187.50
Collateral notes
41,832.50
28 promissory notes
$423,080.00
Total
$530,100.00
AVL made monthly payments on the wrap note, excluding the proportionate amounts paid by the purchasers of the mutual ownership contracts, and took deductions for these payments on its Federal income tax returns for 1973 and 1974. [8] AVL was responsible for all renovations of Fairfax West and deducted the costs of renovation on its Federal income tax returns for 1973 and 1974. AVL also collected and kept all rents, cash downpayments, and collateral personal notes that were paid with respect to the Fairfax West project, and if AVL had not transferred the wrap note to Co-op in exchange for Co-op's transfer of the 396 class A units of Co-op to Aleksandrs, AVL also would have been entitled to receive in 1973 and 1974 the 72 promissory notes that funded *280 the wrap note. In 1973, no individual or entity involved in the Fairfax West project reported as income the 44 promissory notes with face values totaling $704,440. In 1974, no individual or entity involved in the Fairfax West project reported as income the 28 promissory notes with face values totaling $423,080. Aleksandrs did not include in income on his 1973 Federal income tax return the value of the 396 class A units of Co-op that he received in 1973 when AVL assigned the wrap note to Co-op. Co-op treated its acquisition of the wrap note from AVL as a purchase, and included in its basis in the wrap note for purposes of reporting note discount income $396,000, the value of the 396 class A units of Co-op it transferred to Aleksandrs in 1973 in exchange for the wrap note. AVL reported no income or loss in connection with the transfer of the wrap note to Co-op. Respondent determined, by notice of deficiency dated June 3, 1977, that Aleksandrs and his wife, petitioner Cathie Laurins (Cathie), *281 had understated their 1973 gross income from the Fairfax West project in the amount of $990,874 (rental and miscellaneous income in the amount of $114,174, plus the total amount of the proceeds from the sales of the 44 mutual ownership contracts, $876,700). Respondent determined, by notice of deficiency dated February 16, 1979, that Aleksandrs and Cathie had understated their 1974 gross income from the Fairfax West project in the amount of $540,907 (rental income in the amount of $6,412, plus income from the sale of equipment, $3,895, plus the total amount of the corrected proceeds from the sales of the 28 mutual ownership contracts, $530,600). Respondent determined, by notice of deficiency dated June 3, 1977, that AVL had understated its 1973 gross sales income from the Fairfax West project in the amount of $701,320.02 (the total amount of the proceeds from the sales of 44 mutual ownership contracts, $876,700, minus receipts reported by AVL in the amount of $175,379.98). Respondent determined, by notice of deficiency dated February 16, 1979, that AVL had understated its 1974 gross sales income from the Fairfax West project in the amount of $423,080 (the total amount of the corrected *282 proceeds from the sales of the 28 mutual ownership contracts, $530,600, minus receipts reported by AVL in the amount of $107,520). By amended answer in docket No. 9053-77, respondent asserts, in the alternative to his determination that Aleksandrs and Cathie failed to report income in 1973 from the Fairfax West project, that Aleksandrs received a taxable distribution from AVL in 1973 in the amount of $396,000, based on Aleksandrs' receipt in that year of the 396 class A units of Co-op. By amended answers in docket Nos. 6462-79 and 6466-79, respondent asserts, in the alternative to the foregoing determinations, that Co-op is not entitled to include in its basis in the wrap note the value of the 396 class A units of Co-op that it transferred to Aleksandrs in exchange for the wrap note, and therefore claims that Co-op has additional note discount income in the amounts of $1,755 and $3,219 in 1974 and 1975, respectively. II. Chancellery Co-op
In 1971, Aleksandrs entered into negotiations to purchase an apartment building in Washington, D.C., known as the Chancellery Cooperative (Chancellery Co-op). Also in 1971, a limited partnership known as 2139 and 2141 Wyoming Avenue, N.W., D.C. *283 Associates (Wyoming) was formed to develop Chancellery Co-op for sale to the public. Wyoming reported its income and expenses on the accrual method of accounting and filed its Federal returns of income (Forms 1065) on a calendar year basis. At the time of its formation, Aleksandrs was the general partner of Wyoming. In January of 1972, Aleksandrs formed Chancellery Cooperative, Inc. (CCI), a non-profit, non-stock, homeowners' cooperative corporation, for the purpose of taking title to Chancellery Co-op. At all times relevant to this proceeding, Aleksandrs was the president of CCI. On January 20, 1972, Chancellery Co-op was conveyed to CCI for a total purchase price of $400,378. As part of the consideration for the conveyance, CCI took title to Chancellery Co-op subject to a first deed of trust in the amount of $196,217.26, and assumed a second deed of trust in the amount of $54,192.56. On the same date, CCI assigned to Aleksandrs, as the general partner of Wyoming and for sale to the public, the ownership interests in Chancellery Co-op, which were represented by 16 mutual ownership contracts. Also on January 20, 1972, CCI executed three promissory notes to Wyoming in the amounts *284 of $40,000, $40,000, and $246,897.18. The purpose of these notes was to fund renovations on Chancellery Co-op. The notes were secured by a deed of trust on Chancellery Co-op (the third deed of trust), and were assigned by Wyoming to Co-op, the same limited partnership that was involved in the Fairfax West transaction described above, for a total of $241,174.18, which was reported in income by Wyoming in 1972 and 1973. On May 24, 1972, Co-op sold the two $40,000 notes to NMC for $63,568.78, and reported a gain on the sale of $7,568.76. On September 1, 1972, CCI executed a promissory note to Wyoming in the amount of $820,463.98 (the wrap note), which was secured by a deed of trust (the wrap note deed of trust) on Chancellery Co-op. It was expected that each purchaser of a mutual ownership contract would execute a promissory note to CCI in an amount equal to the purchaser's pro rata share of the wrap note, and the wrap note deed of trust required CCI to assign these promissory notes to the holder of the wrap note. The wrap note deed of trust also required the holder of the wrap note to make all payments on the first, second, and third deeds of trust. On September 1, 1972, Wyoming *285 assigned the wrap note to Co-op. In return, Co-op agreed to make the payments on the first, second, and third deeds of trust on Chancellery Co-op, and transferred to Wyoming a partnership interest in Co-op (200 units) valued at $200,000. Aleksandrs, as the general partner of Wyoming, sold mutual ownership contracts for six apartment units in Chancellery Co-op in 1973 and three units in 1974. [9] The purchasers of the contracts made cash downpayments and executed promissory notes either to Aleksandrs or to CCI in amounts equal to their proportionate shares of the wrap note. [10] *286 These promissory notes were secured by the mutual ownership contracts and carried interest at a rate of 8 percent per annum. Upon receiving the promissory notes, Aleksandrs and CCI immediately assigned the notes to Co-op, the owner of the wrap note. The payments on the promissory notes funded the payments to Co-op on the wrap note, and it was intended that the total face value of the promissory notes would equal the face value of the wrap note, $820,463.98. The proceeds from the sales of the mutual ownership contracts in 1973 and 1974 were as follows: 1973
(6 contracts/apartments)
Cash
$126,109.44
6 promissory notes
267,450.56
Total
$393,560.00
1974
(3 contracts/apartments)
Cash
$ 23,273.80
Other property
64,759.77
3 promissory notes
155,640.43
Total
$243,674.00
Wyoming made monthly payments on the wrap note, excluding the proportionate amounts paid by the purchasers of the mutual ownership contracts, and took deductions for these payments on its Federal returns of income (Forms 1065). Wyoming was responsible for all renovations of Chancellery Co-op, and deducted the costs of renovation on its Federal returns of income (Forms 1065). Wyoming also collected and kept all rents and cash downpayments that were paid with respect to the Chancellery Co-op project, and if Wyoming had not transferred the wrap note to Co-op in exchange for the $200,000 partnership interest in Co-op, Wyoming also would have been entitled to receive in 1973 and 1974 the 9 promissory notes that in part funded the wrap note. In 1973, no individual or entity involved in the Chancellery Co-op *287 project reported as income the six promissory notes with face values totaling $267,450.56. In 1974, no individual or entity involved in the Chancellery Co-op project reported as income the three promissory notes with face values totaling $155,640.43. On its 1972 partnership return, Wyoming did not include in income the value of the 200 units of Co-op that it received in 1972 in exchange for transferring the wrap note to Co-op. Co-op treated its acquisition of the wrap note from Wyoming as a purchase, and included in its basis in the note for purposes of reporting note discount income $200,000, the value of the 200 units it transferred to Wyoming in 1972 in exchange for the wrap note. Respondent determined, by notice of deficiency to Aleksandrs and Cathie dated June 3, 1977, and by notice of deficiency to petitioners Lawrence C. Nussdorf and Melanie F. Nussdorf dated April 12, 1977, [11] that Wyoming had understated its 1973 gross sales income from the Chancellery Co-op project in the amount of $270,850.56. [12] Respondent determined, by notice of deficiency to Aleksandrs and Cathie dated February 16, 1979, that Wyoming had understated its 1974 gross sales income from the Chancellery Co-op *288 project in the amount of $155,611.72 (the total amount of the proceeds from the sales of the three mutual ownership contracts, $243,674, minus receipts reported by Wyoming in the amount of $88,062.28). By amended answers in docket Nos. 9052-77, 6462-79, and 6466-79, respondent asserts, in the alternative to the foregoing determinations, that Co-op is not entitled to include in its basis in the wrap note the value of the 200 units of Co-op that it transferred to Wyoming in exchange for the wrap note, and therefore claims that Co-op has additional note discount income in the amounts of $21,868.30, $21,369.05, and $169,024.91, in 1973, 1974, and 1975, respectively. III. Wisconsin Apartments
On November 13, 1974, AVL entered into a sales contract with Marjorie C. Jawish and Henry Jawish for the purchase of a 49-unit *289 apartment building located in Washington, D.C. (Wisconsin Apartments). The sales contract provided for a purchase price of $750,000, consisting of a cash downpayment of $75,000 and a purchase money mortgage in the amount of $432,000, and further provided that the purchaser would take title subject to a first deed of trust in the amount of $148,000, and a second deed of trust in the amount of $95,000. The sales contract also provided that title to the property would be taken in a name designated at settlement. On December 6, 1974, Aleksandrs formed 2720 Wisconsin Avenue Cooperative Association, Inc. (2720 WACA), a non-profit, non-stock, homeowners' cooperative corporation, for the purpose of taking title to Wisconsin Apartments. At all times relevant to this proceeding, Aleksandrs was the president of 2720 WACA. On December 5, 1974, pursuant to articles of incorporation that were filed on January 6, 1975, Aleksandrs formed a corporation known as Wisconsin Avenue Associates, Inc. (Wisconsin), to develop Wisconsin Apartments for sale to the public. Wisconsin reported its income and expenses on the accrual method of accounting. On December 6, 1974, 2720 WACA took title to Wisconsin *290 Apartments subject to a first deed of trust in the amount of $148,815.79, and a second deed of trust in the amount of $95,000. On the same date, 2720 WACA assigned to Wisconsin for sale to the public the ownership interests in Wisconsin Apartments, which were represented by 49 mutual ownership contracts. Also on December 6, 1974, 2720 WACA executed a promissory note secured by a deed of trust on Wisconsin Apartments that was payable to Marjorie C. and Henry D. Jawish in the amount of $431,184.21. On the same date, 2720 WACA executed a promissory note secured by a deed of trust on Wisconsin Apartments to Wisconsin in the amount of $945,000 (the wrap note). It was expected that each purchaser of a mutual ownership contract would execute a promissory note to 2720 WACA in an amount equal to the purchaser's pro rata share of the wrap note. The deed of trust that secured the wrap note required 2720 WACA to assign these promissory notes to the holder of the wrap note. On December 6, 1974, Aleksandrs formed a limited partnership known as the 2720 Limited Partnership (2720 Ltd.). The limited partner of 2720 Ltd. was Aleksandrs' daughter, Kimberly, and the general partner was Conference *291 Management Group, Inc. (CMG), a corporation formed and controlled by Aleksandrs. On December 13, 1974, Wisconsin assigned the wrap note to 2720 Ltd. On or about December 17, 1974, 2720 Ltd. assigned the wrap note to Real Development Management, Inc. (RDM), a corporation that Aleksandrs formed in December of 1974. In return, RDM executed a promissory note to 2720 Ltd. in the amount of $200,000, with principal and interest payable in 10 years. On or about December 20, 1974, RDM transferred the wrap note to Co-op, the same limited partnership that was involved in the Fairfax West and Chancellery Co-op transactions described above, in exchange for 200 class A units of Co-op valued at $1,000 per unit. At all times relevant to this proceeding, Aleksandrs owned or controlled 2720 WACA, Wisconsin, 2720 Ltd., RDM, and Co-op. In 1975, Wisconsin sold mutual ownership contracts for 32 apartment units in Wisconsin Apartments. As Wisconsin sold the contracts, downpayments of cash and small collateral personal notes were paid to Wisconsin, and each purchaser executed a promissory note to 2720 WACA in an amount equal to his or her pro rata share of the wrap note. These promissory notes were secured *292 by the mutual ownership contracts and carried interest at a rate of 8 percent per annum. Upon receiving the promissory notes, 2720 WACA immediately assigned the notes to Co-op, the owner of the wrap note. The payments received by 2720 WACA on the promissory notes funded the payments to Co-op on the wrap note, and it was intended that the total face value of the promissory notes would equal the face value of the wrap note, $945,000. The proceeds from the sales of the 32 mutual ownership contracts in 1975 were as follows: Cash
$151,360
Collateral notes
53,620
32 promissory notes
$637,580
Total
$842,560
Wisconsin made monthly payments on the wrap note, excluding the proportionate amounts paid by the purchasers of the mutual ownership contracts, and took deductions for these payments on its Federal income tax return for the year in issue. [13] Pursuant to an agreement between 2720 WACA and Wisconsin dated December 6, 1974, Wisconsin was responsible for all renovations of Wisconsin Apartments, and Wisconsin deducted the costs of renovation on its 1975 Federal income tax return. Wisconsin also collected and kept all rents, cash downpayments, and collateral personal notes that were paid with respect *293 to the Wisconsin Apartments project, and if Wisconsin had not transferred the wrap note to 2720 Ltd., Wisconsin also would have been entitled to receive in 1975 the 32 promissory notes that in part funded the wrap note. In 1975, no individual or entity involved in the Wisconsin Apartments project reported as income the 32 promissory notes with face values totaling $637,580. RDM did not file a Federal income tax return for 1974, and did not include in income on its Federal income tax return for 1975 the value of the 200 class A units of Co-op it received in exchange for transferring the wrap note to Co-op. [14]
Co-op treated its acquisition of the wrap note from RDM as a purchase, and included in its basis in the wrap note for purposes of reporting note discount income $200,000, the value of the 200 class A units of Co-op it transferred to RDM in 1974 in exchange for the wrap note. Respondent determined, *294 by notice of deficiency to Consolidated Western Investors, Inc., dated February 16, 1979, that Wisconsin had understated its 1975 gross sales income from the Wisconsin Apartments project in the amount of $644,250 (the total proceeds from the sales of the 32 mutual ownership contracts, $842,560, minus receipts reported by Wisconsin in the amount of $198,310). Respondent also determined, by notice of deficiency dated February 16, 1979, that Aleksandrs received a taxable distribution from Wisconsin in 1974 in the amount of $200,000. By amended answer in docket No. 6466-79, respondent asserts, in the alternative to the foregoing determinations, that Co-op is not entitled to include in its basis in the wrap note the value of the 200 class A units of Co-op it transferred to RDM in exchange for the wrap note, and therefore claims that Co-op has additional note discount income in 1975 in the amount of $1,409. IV. Pleasant Hill Associates
A. Purchase of the Apartments by Co-op
On December 18, 1972, AVL entered into an agreement with Norman R. Bruce to purchase the Pleasant Hill Road Apartments (the Apartments) for a total purchase price of $1,182,250. On January 17, 1973, AVL entered into *295 a second agreement to purchase the Apartments for a total purchase price of $1,080,000. The parties intended the second agreement to supersede the first agreement. The Apartments consisted of 86 apartment and town house units located in Fulton County, Georgia. The intent was to purchase the Apartments and convert the units to condominiums for sale to the public. On February 16, 1973, Co-op, the same partnership that was involved in Fairfax West, Chancellery Co-op, and Wisconsin Apartments projects described above, borrowed $231,758 from NMC (the NMC loan). The NMC loan was extended by agreement dated August 16, 1974, and on that date, AVL paid $47,258 to reduce the balance of the loan to $184,500. The NMC loan was guaranteed by AVL, Aleksandrs, and Aleksandrs' wife, Cathie. The NMC loan was obtained in order to pay the cash downpayment to purchase the Apartments and also to pay for the cost of converting the units to condominiums. On March 1, 1973, the Apartments were conveyed to Co-op for a total purchase price of $1,072,793.88. AVL never acquired legal title to the Apartments. Co-op took title to the property subject to an existing mortgage on the Apartments (the mortgage), *296 which was payable to Decatur Federal Savings and Loan Association (Decatur), and which had a principal balance on March 1, 1973, of $940,031.47. The earnest money and cash paid at settlement totaled $134,614.61. B. The Pleasant Hill Partnership
Pleasant Hill Associates (Pleasant Hill) was formed as a Maryland limited partnership on or about January 2, 1973. It reported its income and expenses on the accrual method of accounting. Neither the limited partnership agreement of Pleasant Hill nor a certificate of limited partnership for Pleasant Hill was filed in any office of the State of Maryland during 1973, 1974, or 1975. The limited partnership agreement of Pleasant Hill reflects the following: Percentage of
Partner
Partner Status
Partnership Interest
AVL
general partner
0
James G. Norman
limited partner
24%
Janis Laurins
limited partner
4%
Charlene Baden
limited partner
12%
Aleksandrs
limited partner
33%
AVL
limited partner
27%
100% By addendum dated January 1, 1974 (and signed only by Aleksandrs) certain transfers of limited partnership interests became effective, resulting in new limited partnership interests as follows: Resulting Percentage
Partner
of Partnership Interest
Aleksandrs
13.50%
Janis Laurins
.75%
Charlene Baden
2.50%
AVL
38.25%
James G. Norman
4.00%
LVA Construction Co., Inc.
11.50%
VAL Management Co., Inc.
4.50%
Metropolitan Mortgage Bankers, Inc.
8.00%
VLA Advertising Co., Inc.
17.00%
100.00% By *297 addendum dated January 1, 1975 (and signed only by Aleksandrs) certain transfers of limited partnership interests in Pleasant Hill became effective, resulting in new limited partnership interests as follows: Resulting Percentage
Partner
of Partnership Interest
Aleksandrs
30.50%
Janis Laurins
.75%
Charlene Baden
7.00%
AVL
38.25%
James G. Norman
15.50%
Metropolitan Mortgage Bankers, Inc.
8.00%
100.00% With respect to the capital contributions to Pleasant Hill, the limited partnership agreement provided that "[t]he capital contribution of the Limited Partners shall be a personal liability, to the partnership in proportionate part of their partnership interest for all of the debts of the partnership." The partnership agreement also provided that the general partner (AVL) was to contribute "any right, title and interest said general partner has as contract of the * * * [Apartments]." The limited partners made no contributions of property or money to the capital of Pleasant Hill in 1973 and 1974. A schedule of partnership capital contributions and losses reflects that the limited partners made the following capital contributions to Pleasant Hill in 1975: Partner
Amount
Form
Aleksandrs
$113,400.00
Promissory note
Janis Laurins
6,900.00
Promissory note
Charlene Baden
26,900.00
Promissory note
James G. Norman
51,000.00
Promissory note
AVL
90,000.00
Notes
AVL
277,019.64
Debt transfer
*298 The promissory notes from the individual limited partners were payable to Pleasant Hill 5 years from the dates of the notes with no interest. The promissory note from Aleksandrs was dated December 3, 1975, and the promissory notes from the other limited partners were dated December 31, 1975. James G. Norman (James) was a business associate of Aleksandrs during 1973, 1974, and 1975. Janis Laurins (Janis) is Aleksandrs' father. Charlene Baden (Charlene) was Aleksandrs' accountant. Metropolitan Mortgage Bankers, Inc. (MMB), LVA Construction Co., Inc. (LVACC), VLA Advertising Co., Inc. (VLAAC), and VAL Management Co., Inc. (VALM), were subsidiaries of petitioner LAV Shell Co., Inc. (LAV Shell) in 1974, and in that year LAV Shell was owned by Aleksandrs' daughter, Kimberly. C. Operation of the Apartments -- Pleasant Hill Book Entries
AVL attempted to convert the Apartments to condominiums and commenced sales activities in April of 1973. AVL entered into sales contracts and accepted deposits on several units in the Apartments during 1973 and 1974, but no sales contracts concerning the Apartments ever went to settlement. For the years 1973, 1974, and 1975, AVL maintained a checking *299 account (the escrow account) to pay the liabilities of numerous partnerships. AVL also used the escrow account with respect to the business of converting the Apartments to condominiums. All deposits, withdrawals and checks drawn on the account pertaining to the Apartments were accounted for by corresponding entries in the journals and ledgers of Pleasant Hill. On March 1, 1973, Co-op paid $100,000 out of the proceeds of the $231,758 NMC loan as part of the settlement price on the Apartments. From March 16, 1973, to December 25, 1973, Co-op issued six checks out of the proceeds of the NMC loan totaling $131,758 to AVL for deposit to the escrow account. Various ledger entries were made in the ledgers of Co-op and Pleasant Hill to account for these checks. Payments on the mortgage were made by AVL to Decatur by checks drawn on the escrow account. Before any condominium sales were consummated, Decatur foreclosed on the mortgage in 1974. As of December 31, 1974, the books of AVL reflected that Pleasant Hill owed $277,019.64 to AVL. On that date, the debit balance was reduced to zero on AVL's books. However, the $277,019.64 credit balance on the books of Pleasant Hill was not reduced *300 to zero. There was no payment by Pleasant Hill to AVL with respect to the $277,019.64 debit balance. Instead, AVL transferred the debit balance to its retained earnings account as a reduction of retained earnings. AVL treated this as a contribution to Pleasant Hill to the extent of $277,019.64. As of December 31, 1974, the only purported partnership liability of Pleasant Hill was that pertaining to the proceeds of the NMC loan in the amount of $222,676. Between January 8, 1975, and March 17, 1975, entries were made to the Co-op general ledger to reflect a total debt reduction between Pleasant Hill and Co-op on the proceeds of the NMC loan in the amount of $222,676. The debt reduction entries were accomplished by certain transfers to Co-op from VLAAC, LVACC, and AVL. Specifically, VLAAC transferred $41,364.79 in notes for $18,676 of debt reduction, and 57 units of Co-op for $57,000 of debt reduction. LVACC transferred 57 units of Co-op for $57,000 of debt reduction, and AVL transferred notes for $90,000 of debt reduction. In 1973, Pleasant Hill claimed a total loss from the Apartments in the amount of $75,491 on its 1973 partnership return. The following represents the distributive *301 shares of Pleasant Hill losses claimed on petitioners' 1973 Federal income tax returns and the amount of the losses disallowed by respondent that are at issue in these consolidated cases: Petitioner(s)
Claimed Losses
Disallowed Losses
Aleksandrs & Cathie
$24,912.03 $24,912.03 Janis
3,019.64
3,019.64
Charlene
9,058.92
9,058.92
James
18,117.34
18,117.34
In 1974, Pleasant Hill claimed a total loss from the Apartments in the amount of $424,204 on its 1974 partnership return. The following represents the distributive shares of Pleasant Hill losses claimed on petitioners' 1974 Federal income tax returns and the amounts of the losses disallowed by respondent that are at issue in these consolidated cases: Petitioner(s)
Claimed Losses
Disallowed Losses
Aleksandrs & Cathie
$ 57,267.54  $ 57,267.54  Janis
3,181.52
3,181.52
Charlene
10,605.07
10,605.07
LAV Shell (Subsidiaries)
AVL
$162,259.00  $107,242.00  VALM
19,089.00
19,089.00
VLAAC
72,344.00
72,344.00
LVACC
48,783.00
48,783.00
MMB
33,936.00
33,936.00
In 1975, Pleasant Hill claimed a total loss from the Apartments on its 1975 partnership return of $102,000. The following represents the distributive shares of Pleasant Hill losses claimed on petitioners' 1975 Federal income tax *302 returns and the amounts of these losses disallowed by respondent that are at issue in these consolidated cases: Petitioner(s)
Claimed Losses
Disallowed Losses
Aleksandrs & Cathie
$31,293.00  $31,293.00  Janis
769.50
769.50
Charlene
7,182.00
7,182.00
V. Sundown Associates
A. Formation of Sundown
Sundown Associates (Sundown) was formed as a Virginia limited partnership in November of 1973. At the time of its formation, AVL was the general partner. Arthur R. Pomponio, Thomas J. Broyhill, Ben H. Cooper, and Arthur M. Pomponio were limited partners. At all material times, Aleksandrs was the president of AVL, but was never a partner of Sundown. Sundown was formed for the purpose of acquiring the Park Alexandria Apartments (the Apartments), a 283-unit apartment building in Alexandria, Virginia, and converting the apartment units to condominiums for sale to the public. B. Purchase of the Apartments -- FMI Loans
On or about May 20, 1973, AVL entered into an agreement with the B.F. Saul Company (B. F. Saul) to purchase the Apartments for $4,400,000. Existing financing on the Apartments consisted of a mortgage in the amount of approximately $2,480,000 payable to Equitable Life Assurance Society (Equitable). *303 On November 1, 1973, AVL received construction and permanent loan commitments from First Mortgage Advisory Corporation (FMI) for loans up to $6,665,000 for the purpose of acquiring and converting the Apartments to condominiums. Aleksandrs, Ben Cooper, Thomas Broyhill, and Arthur R. Pomponio (and their respective wives) were to be the guarantors of the loans. The construction loan was to be paid 18 months from funding, and the permanent loan commitment was for the same period. On November 5, 1973, the purchase agreement between AVL and B. F. Saul was amended to increase the purchase price to $4,447,000. On December 26, 1973, B. F. Saul conveyed the Apartments to AVL for $4,447,000 subject to the Equitable mortgage. When AVL purchased the Apartments, it was acting on behalf of Sundown. Pursuant to the Sundown partnership agreement, the Apartments constituted AVL's capital contribution to the partnership. On December 26, 1973, the construction loan was closed, and AVL executed a promissory note to FMI secured by a deed of trust on the Apartments. Also on December 26, 1973, AVL and Aleksandrs entered into an agreement which provided that Aleksandrs would be entitled to both the first *304 $100,000 of net profit realized by AVL and the first $50,000 of tax loss attributable to AVL from the development of the Apartments. C. Sundown's 1973 Partnership Return
Sundown reported its income and expenses for Federal income tax purposes on the cash method of accounting and filed its Federal returns of income (Forms 1065) on a calendar year basis. In 1973, Sundown had no income from rents or sales with respect to the Apartments. On its 1973 partnership return, Sundown reported a total loss of $460,135.56, comprised primarily of the following: Title insurance
$ 10,173.00
Loan recordation
18,825.00
Loan fees
286,613.00
Appraisal report
7,830.00
Feasibility study
1,369.77
Legal fees
12,000.00
Organization expense
50,000.00
Advertising
70,000.00
Total
$456,810.77
AVL's claimed distributive loss from Sundown was 10 percent of the total claimed loss, $460,135.56, or $46,013.56. Aleksandrs deducted the $46,013.56 AVL loss from Sundown on his 1973 Federal income tax return and respondent disallowed the deduction. D. Events in 1974 and 1975
1. Advertising Expense
In 1974, VLAAC had total cash receipts of $140,000, all of which came from Sundown ($70,000 in January of 1974 and $70,000 in July of 1974). *305 VLAAC had total cash disbursements in 1974 of $72,011.59. In 1975, VLAAC had total cash receipts of $25,095.57, $20,340.74 of which came from Sundown. VLAAC had total cash disbursements in 1975 of $5,161.50, $4,000 of which was paid as rent. Sundown deducted on its 1974 partnership return $86,539.86 as an advertising expense, and respondent disallowed $70,000 of the deduction. 2. FMI Loan Interest Expense
FMI calculated interest on the FMI loan monthly and charged it to principal through October 9, 1974. The monthly interest charges added to principal during 1974 totaled $286,623.47. Commencing September 30, 1974, additional interest charges were added to a separate interest balance in the total amount of $176,757.76. Thus, as of December 31, 1974, accrued interest on the FMI loan totaled $463,381.23 ($286,623.47 plus $176,757.76). Interest accrued on the FMI loan for 1975 in the amount of $423,283.59. The total interest liability was reduced in part on November 17, 1975, by FMI applying the proceeds of a letter of credit issued to FMI in the amount of $140,850. Sundown claimed an interest expense deduction on its 1974 partnership return in the total amount of $606,109.49. *306 Of this amount, $465,064.46 pertained to the FMI loan and was posted on the books of Sundown as a journal entry and added to the principal of the loan. Sundown claimed an interest expense deduction on its 1975 partnership return in the total amount of $767,631. Of this amount, $610,053 was claimed by Sundown to be attributable to the FMI loan. Respondent disallowed $465,064 of the interest claimed in 1974 and $610,053 of the interest claimed in 1975. 3. Legal Fees
In 1974, Sundown paid legal fees in the amount of $4,607 and deducted this amount on its 1974 partnership return. In 1975, Sundown paid $5,432 in legal fees and deducted this amount on its 1975 partnership return. Both deductions were disallowed by respondent. 4. Sales Expense
Sundown took a deduction on its 1974 partnership return for $15,716.12 that was paid to ALV Sales Co., Inc. There were no sales of condominiums in 1974. Respondent disallowed the deduction. 5. Overhead
Sundown paid AVL $120,000 for developer's overhead and deducted this amount on its 1974 partnership return. Respondent disallowed the deduction. 6. Permanent Lender's Commitment Fee
Sundown made a journal entry in 1974 for a permanent lender's *307 commitment fee in the amount of $11,000 and took a deduction for this fee on its 1974 partnership return. Respondent disallowed the deduction and amortized it over 1974 and 1975. 7. Miscellaneous Expenditures
In 1974, Sundown incurred an expense with respect to a security system in the amount of $5,197.25, and an expense for electrical work in the amount of $9,048.58. Sundown deducted these amounts on its 1974 partnership return. Of the $5,197.25 expense, $2,500 was expended for an identiphone system. Of the $9,048.58 expense, $7,741 was spent on electrical improvements. Respondent disallowed as deductions the amount spent on the identiphone system ($2,500) and the amount spent on electrical improvements ($7,741) and capitalized these amounts as improvements. In 1975, Sundown spent $18,137 for dishwashers, a refrigerator, plumbing improvements, and air conditioning, and deducted this amount as repairs and maintenance on its 1975 partnership return. Respondent disallowed the deduction and capitalized it. 8. Depreciation
Sundown claimed a depreciation deduction on its 1974 partnership return in the amount of $182,071.62. Sundown claimed a useful life of 25 years on the building *308 and 20 years for renovations. Respondent determined that the useful life of the building was 35 years, reduced the amount of depreciable improvements and changed the useful life of the improvements from 20 years to 10 years. This resulted in respondent disallowing claimed depreciation in the amounts of $51,703 and $74,931 in 1974 and 1975, respectively. 9. Termination of AVL as General Partner
AVL terminated its involvement as general partner in the Sundown partnership on May 15, 1975. On that date, AVL executed a quit claim deed with respect to the Apartments to the Sundown limited partners. VI. CWI
A. AIS Contract Income
Aries Information Systems, Inc. (AIS), was incorporated on January 27, 1975, as a subsidiary of petitioner Consolidated Western Investors, Inc. (CWI). AIS maintained its books and records for 1975 on the accrual method of accounting. During 1975, AIS entered into various licensing contracts for computer software products and services with unrelated parties. Pursuant to the contracts, AIS had prepaid cash receipts in 1975. With respect to eight of the contracts, the contract period, contract budget, cash received in 1975, and amounts treated by AIS on the *309 CWI consolidated return as earned and unearned income were as follows: Contract
Contract
Cash
Earned
Unearned
Period
Name
Budget
Receipts
Income
Income
1/1/75 -- 1/1/78
Compton College
$ 14,000
$ 14,000
$ 1,400
$12,600
8/24/75 -- 8/24/78
Education #3
7,500
7,500
750
6,750
8/24/75 -- 8/24/78
Multinomah
14,000
14,000
10,500
3,500
8/24/75 -- 8/24/78
John Abbott
7,500
7,500
6,000
1,500
8/24/75 -- 8/24/78
Union Univ.
6,000
6,000
2,400
3,600
8/24/75 -- 8/24/78
Beverly Hills
6,000
6,000
6,000
7/1/75 -- 7/1/80
Alaska
50,400
55,800
53,280
2,520
8/1/75 -- 1/15/76
Luther College
4,000
4,000
3,600
400
$109,400
$114,800
$77,930
$36,870
AIS did not include in income for 1975 the $36,870 in cash receipts from the eight contracts that it designated as unearned income. Respondent determined that this amount was includable in income in 1975. B. Real Estate, Inc.'s, Management and Consulting Expense
On its corporate income tax return for 1975, petitioner Real Estate Equity Management, Inc. (Real Estate, Inc.), claimed a management and consulting expense deduction in the amount of $25,000. On the CWI consolidated return for 1975, Real Development Management, Inc. (RDM), reported $25,000 of income from management and related services. RDM recorded the $25,000 *310 as a journal entry in 1975 "to record income due from Real Estate, Inc." Respondent disallowed the deduction taken by Real Estate, Inc., and reduced the corresponding income of RDM. C. RDM Interest Expense
As part of the Wisconsin Avenue Apartments transaction described in section III above, RDM executed a $200,000 note to 2720 Ltd., dated December 17, 1974. The note provided that interest on the note would accrue at the rate of 10 percent per year, and that interest and principal would be payable 10 years from the date of the note. RDM was incorporated on December 15, 1974, with Aleksandrs as president. It maintained its books and records on the accrual method of accounting. RDM was a subsidiary of CWI in 1975, and Kimberly, Aleksandrs' daughter, owned more than 80 percent of CWI in 1975. 2720 Ltd. had one limited partner, Kimberly, who held a 50-percent interest in the partnership. Conference Management Group, Inc. (CMG), a corporation, was its general partner and held the remaining 50-percent interest in 2720 Ltd. Aleksandrs' family owned the stock of CMG. 2720 Ltd. maintained its books and records on the cash method of accounting. In 1975, RDM claimed a $20,000 interest expense *311 deduction with respect to the $200,000 note. The $20,000 was never paid to 2720 Ltd., and 2720 Ltd. did not include the $20,000 in income in 1975. Respondent disallowed the deduction. D. MMB Bad Debt Deduction
Metropolitan Mortgage Bankers, Inc. (MMB), purchased accounts receivable in the amount of $33,966.79 from E.F. Shelley and Co., Inc. (EFS Company). MMB claimed a bad debt deduction in 1975 in the amount of $34,326.79 based on the face amount of the accounts. Respondent disallowed the deduction. E. EFS Company Loss and the MMB Excess Loss Account
On March 31, 1975, MMB acquired all of the outstanding stock of EFS Company for $82,826.52. MMB paid $20,706.63 in cash and gave notes for the balance of the purchase price. There were no distributions out of the earnings and profits of EFS Company during the relevant years. EFS Company was insolvent as of December 31, 1975, with assets of $26,212.77 and liabilities of $622,460.42. As a result, MMB's stock in EFS Company was worthless as of December 31, 1975. EFS Company reported a loss on the CWI consolidated return for the period February 28, 1975, to December 31, 1975, in the amount of $242,964. Respondent disallowed $61,528 *312 of this loss (the amount attributable to the period March 1, 1975, to March 31, 1975) on the ground that EFS Company was not a member of the CWI consolidated group until March 31, 1975. In addition to determining that a portion of EFS Company's loss was not includable on the CWI return, respondent determined that MMB had ordinary income in 1975 in the amount of $164,628, resulting from the excess loss recaptured upon the worthlessness of the EFS Company stock. Respondent also determined that EFS Company was not entitled to a $16,808 loss on the sale of certain assets. [15]
F. Net Operating Loss Carryovers From 1974
The following net operating loss carryovers from 1974 were claimed by members of the CWI consolidated group in 1975: Member
Amount
AVL
$67,223
LVACC
605
VLAAC
649
VALM
1,036
ALV Sales
852
MMB
383
Respondent disallowed these losses based on his determination that the foregoing members of the CWI consolidated group did not incur net operating losses in 1974. *313 G. Filing of the 1975 CWI Corporate Return
The consolidated Federal corporation income tax return of CWI for the taxable year ended December 31, 1975, was received by the Philadelphia Service Center of the Internal Revenue Service on April 19, 1976. No extension for filing was sought or obtained with respect to the 1975 CWI return. VII. Co-op
A. Principal Payments on Notes in 1973 and 1974
Co-op Mortgage Investment Associates (Co-op), the same Co-op that was involved in the Fairfax West, Chancellery Co-op, Wisconsin Apartments, and Pleasant Hill projects described above, was formed as a limited partnership in December of 1971. AVL was the general partner of Co-op in 1973 and part of 1974. Real Estate, Inc., became the general partner at the end of 1974 and continued as the general partner into 1975. Co-op filed its partnership returns for 1973, 1974, and 1975 using the accrual method of accounting. The partnership agreement provided that the class A limited partners were to contribute notes for which they would receive one class A unit of the partnership for each $1,000 of principal of the notes. The partnership agreement also provided that class A partners were to receive *314 10 percent per annum on their investment after class B partners were paid 15 percent per annum. In 1973 and 1974, the class A and class B limited partners received their allotted distributions. Remaining profits were to be distributed to the general partner. On December 31, 1971, Aleksandrs transferred 14 notes (with a total principal balance due of $117,044.19) and $455.81 in cash, subject to a loan in the amount of $17,500, to Co-op in return for 100 class A units of Co-op valued at $100,000. Prior to the transfer, the 14 notes were installment obligations in the hands of Aleksandrs with a zero basis. Aleksandrs had elected section 453 treatment with respect to the notes in 1971, and the character of the income to Aleksandrs was ordinary. Aleksandrs reported no income on the transfer of the notes to Co-op. As Co-op received payments on the notes, it reported income only with respect to the interest portion of the payments. In 1973, Co-op received $5,092.21 in principal payments on the notes. Co-op did not include the $5,092.21 amount in income on its 1973 partnership return. In 1974, Co-op received $2,671.34 in principal payments on 11 of the 14 notes. Co-op did not include *315 the $2,671.34 amount in income on its 1974 partnership return. Respondent determined that Co-op had additional income of $5,092 in 1973 and $2,671.34 in 1974 as a result of its receipt of principal payments on the notes. B. Income From Sale of Notes in 1974
In 1974, Co-op sold 11 of the 14 notes referred to in section VII.A. above, along with 4 other unrelated notes (collectively referred to as the Seward Square notes) for a total sales price of $73,000. Of this amount, Co-op reported $488.47 as interest income. The balance of the purchase price, $72,511.53, was offset against the principal balance due on the notes of $78,863.27. The $6,351.74 difference ($78,863.27 minus $72,511.53) was claimed as a loss by Co-op on its 1974 partnership return. Respondent allocated $72,511.53, the total sales price less the interest reported by Co-op, between the 11 notes contributed by Aleksandrs and the 4 other unrelated notes. By virtue of the allocation, respondent determined that $54,720.83 of the total sales price was received for the 11 notes in which Co-op had a zero basis. As a result, respondent determined that Co-op had additional income of $54,720.83 received as sales proceeds for *316 the 11 notes. C. Note Discount Income in 1973
The books of Co-op reflected that it had note discount income in the amount of $10,564.33 for 1973. Co-op reported half of this income ($5,282) as long-term capital gain and half as ordinary income on its 1973 partnership return. Under the partnership agreement, AVL, as the general partner, was allocated all of the income from capital gains in 1973. Co-op reported the $5,282 long-term capital gain on AVL's Schedule K-1. AVL, however, did not report the $5,282 long-term capital gain on its 1973 income tax return. In addition, Co-op acquired the Chancellery Co-op wrap note at a discount of $113,497.42. In computing the amount of reported note discount income for 1973, Co-op calculated the discount income from return of principal on the Chancellery Co-op wrap note based on a discount of only $51,774.24, or income of only $3,961.34. Co-op omitted from income the portion attributable to the discount of $61,723.18, or $4,723. Respondent determined that AVL had additional note discount income in 1973 in the amount of $10,005 ($5,282, the amount representing the unreported capital gain, which was recharacterized by respondent as ordinary *317 income, plus $4,723, unreported note discount income from the Chancellery Co-op wrap note). D. Note Discount Income in 1974
The books of Co-op reflected that it had note discount income in the amount of $30,536.98 in 1974. Co-op reported the entire amount as long-term capital gain on its 1974 partnership return. In 1974, Real Estate, Inc., replaced AVL as the general partner of Co-op, and under the partnership agreement was allocated the entire capital gain income. Co-op reported the $30,536.98 long-term capital gain on Real Estate, Inc.'s Schedule K-1. Real Estate, Inc., was a subsidiary of petitioner LAV Shell in 1974. The $30,536.98 long-term capital gain was not reported on the LAV Shell 1974 consolidated income tax return. However, Real Estate, Inc., reported $15,268 of the $30,536.98 note discount income as ordinary income in 1974. Respondent determined that Co-op had note discount income of $29,833.12 in lieu of the $30,536.98 calculated by Co-op, and further determined that the entire amount was reportable as ordinary income. This ordinary income was attributed by respondent to Real Estate, Inc., in 1974. E. Note Discount Expense
Co-op claimed a $13,601.34 note discount *318 expense on its partnership return for 1974. Of this amount, $6,351.74 was attributable to the sale of the Seward Square notes. See section VII.B., supra. Respondent disallowed $13,486.84 of the claimed expense. [16]
F. 1975 Adjustments
Co-op reported total note discount income on its 1975 partnership return of $86,575.93. It reported half of this amount ($43,288) as long-term capital gain and half as ordinary income. In December of 1975, the mortgagors of the Chancellery Co-op wrap note paid the note off and Co-op claimed deductions in connection with the payoff totaling $65,638. Respondent determined that, as an expense, the deductions were not allowable. Instead, respondent determined that the $65,638 was an addition to basis, and he therefore reduced the note discount income of $86,575.93 by the capitalized expense of $65,638, which resulted in a net note discount income of $20,937.93. Respondent further determined that Co-op had additional note discount income of $12,552.07, for a total reportable note discount *319 income of $33,490. Respondent then determined that the note discount income was properly reportable as ordinary income, and not half capital gain, and reduced the note discount income reported as ordinary income by $9,798 ($43,288 minus $33,490) and eliminated the originally reported long-term capital gain. [17] VIII. The Harvey Marcus Note
Harvey Marcus executed a promissory note (the Marcus note) to AVL in connection with the purchase of real property in Washington, D.C. The principal amount of the note was $239,813.54. In December of 1972, AVL assigned the Marcus note to Co-op in return for Co-op transferring to Aleksandrs in 1973 72 class A units of Co-op valued at $1,000 per unit. Co-op treated its acquisition of the Marcus note as a purchase, and included in its basis in the note for purposes of reporting note discount income the value of the 72 class A units of Co-op, $72,000. Aleksandrs did not include the value of the 72 Co-op units in *320 income on his 1973 Federal income tax return. In the Second Amendment to Amended Answer in Docket No. 9053-77, respondent claims that Aleksandrs has additional income of $72,000 in 1973, based on his receipt of the 72 class A units of Co-op. In the amended answers filed in docket Nos. 9052-77, 6462-79, and 6466-79, respondent asserts that if Aleksandrs does not have additional income in 1973 as a result of his receipt of the 72 units of Co-op, then Co-op is not entitled to include in its basis in the Marcus note the value of the 72 class A units of Co-op that it transferred to Aleksandrs in exchange for the note, and therefore claims that Co-op has additional note discount income in 1973, 1974, and 1975 in the amounts of $422, $832, and $822, respectively. IX. Miscellaneous Adjustments
A. Aleksandrs
1. Syndication Expense
Aleksandrs claimed a deduction of $37,221 on his 1973 Federal income tax return for "syndication expense." This amount represents the net cash downpayment on Fairfax West. Respondent disallowed the deduction. 2. Short-Term Capital Loss
Aleksandrs claimed a short-term capital loss on his 1973 Federal income tax return in the amount of $1,988. Respondent disallowed *321 the portion of this loss in excess of $1,000, or $988. 3. Dividend Income
Based on an analysis of AVL's exchange account for Aleksandrs, respondent determined that Aleksandrs had dividend income in the amount of $10,232 and $92 in 1974 and 1975, respectively. 4. Gold Futures Trading Loss
Aleksandrs claimed a "loss on investment" of $7,060 on his 1975 Federal income tax return. The loss arose as the result of gold futures trading by Aleksandrs. Respondent disallowed the loss. 5. Transfer Tax on Personal Residence
Aleksandrs paid a transfer tax in 1974 in the amount of $1,547 on the purchase of a personal residence, and he deducted this amount on his 1974 Federal income tax return. Respondent disallowed the deduction. B. LAV Shell
1. AVL's Note Discount Expense
On the 1974 consolidated Federal income tax return of LAV Shell, AVL claimed a note discount expense in the amount of $6,365. This expense was purportedly incurred in connection with a sale of notes by AVL to VLAAC. Respondent disallowed the deduction. 2. AVL's Debt Reduction Expense
AVL claimed a debt reduction expense on the 1974 consolidated Federal income tax return of LAV Shell in the amount of $20,339. The deduction *322 arose from the transfer of a house in Arlington, Virginia, to Co-op to reduce a debt carried on the books of Co-op as a debt of Pleasant Hill. Respondent disallowed the deduction. 3. Real Estate, Inc.'s Investment Reserve Expense
Real Estate, Inc., claimed an investment reserve expense on the 1974 consolidated Federal income tax return of LAV Shell in the amount of $15,000. Respondent disallowed the deduction. C. Charlene Charlene deducted $1,200 for charitable contributions on her 1975 Federal income tax return. Respondent disallowed the deduction. D. Additions to Tax
1. Respondent determined that Charlene was liable for an addition to tax for negligence pursuant to section 6653(a) for 1974 and 1975. 2. Respondent determined that LAV Shell was liable for an addition to tax for negligence pursuant to section 6653(a) for 1974. 3. Respondent determined that Real Estate, Inc., was liable for an addition to tax for negligence pursuant to section 6653(a) for 1975. 4. Respondent determined that CWI was liable for an addition to tax for negligence pursuant to section 6653(a) for 1975. Respondent also determined that CWI was liable for an addition to tax pursuant to section 6651(a)(1) *323 for failure to timely file its 1975 Federal income tax return. 5. Respondent determined that Aleksandrs was liable for an addition to tax for fraud pursuant to section 6653(b) for 1973, 1974 and 1975. X. Aleksandrs
Aleksandrs graduated from Rutgers University School of Law in June of 1967. He was ranked ninth in a class of 50 and was a member of the law review. Prior to law school, he graduated from the University of Oregon in 1965. In 1968, he was admitted to practice law in the District of Columbia and, at the time of trial, was a member of the District of Columbia bar. Also in 1968, Aleksandrs was admitted to practice before the United States Tax Court, and at the time of trial, was a member of the bar of this Court. From July 31, 1967, to October 9, 1970, Aleksandrs was employed full time as a tax attorney by the Office of Chief Counsel of the Internal Revenue Service. While so employed, Aleksandrs served as a trial attorney in the National Office Trial Branch of the Tax Court Division. He also served as a trial attorney in the National Office Technical Branch of the Tax Court Division. During his employment with the Office of Chief Counsel, Aleksandrs was responsible for *324 performing legal work of a highly difficult and responsible nature relating to the trial of cases before the United States Tax Court. Cases assigned to Aleksandrs involved all types of taxpayers and complex issues of fact and law. On March 22, 1968, Aleksandrs satisfactorily completed a course entitled "Individual, Partnership and Simple Corporation Income Tax Law" conducted by the Internal Revenue Service. From October 19, 1970, to April 1, 1971, Aleksandrs was employed in the tax division of Arthur Andersen & Co., a national accounting firm. The practice of the Arthur Andersen tax division consisted of client service in tax-related areas of consulting, planning, compliance, and advocacy. During the years 1973, 1974, and 1975, Aleksandrs considered himself to be a tax expert. At the time of trial and for several years before, Aleksandrs had represented himself to the public as a tax expert. He has written books and held seminars on offshore tax shelters and, at the time of trial, continued to promote tax shelters. OPINION 1. Sales Income From Fairfax West, Chancellery Co-op, and Wisconsin Apartments
The record establishes that during the years in issue, ownership interests (mutual *325 ownership contracts) in three apartment buildings (Fairfax West, Chancellery Co-op, and Wisconsin Apartments) were sold for cash, collateral personal notes, other property, and promissory notes. The record also establishes that the individuals and entities involved in developing the apartment buildings and selling the ownership interests did not report the promissory notes as income during the years in issue. We must decide (1) whether the income from the sales of the 72 Fairfax West mutual ownership contracts in 1973 and 1974 (consisting of cash, collateral personal notes, and 72 promissory notes) is attributable to AVL; [18] *326 (2) whether the income from the sales of the nine Chancellery Co-op mutual ownership contracts in 1973 and 1974 (consisting of cash, other property, and nine promissory notes) is attributable to Wyoming; and (3) whether the income from the sales of the 32 Wisconsin Apartments mutual ownership contracts in 1975 (consisting of cash, collateral personal notes, and 32 promissory notes) is attributable to Wisconsin. [19] Petitioners bear the burden of proof with respect to these issues. Rule 142(a); Welch v. Helvering,290 U.S. 111, 115 (1933). Respondent argues that during the years in issue, AVL, Wyoming, and Wisconsin reaped the benefits and bore the burdens associated with the ownership of Fairfax West, Chancellery Co-op, and Wisconsin Apartments, respectively, and therefore that AVL, Wyoming, and Wisconsin must be treated for tax purposes as the respective owners of these properties during the years in issue. Petitioners do not address respondent's argument. Instead, they assert that (1) the mutual ownership contracts "were sold on an installment sale basis and the entire sales price of each mutual ownership contract * * * was not taxable income in the year of sale," and (2) "the entire record does *327 not show that any specific value was established for the real value of the * * * promissory notes and * * * the * * * promissory notes only had a face value, not a real value, equal to the wrap note * * *." In determining the ownership of property for tax purposes, the basic question is who reaps the benefits and bears the burdens associated with the ownership of the property. See Frank Lyon Co. v. United States,435 U.S. 561, 576-577 (1978). Such an inquiry is a question of fact to be resolved on the basis of all the facts and circumstances of the case. Grodt & McKay Realty, Inc. v. Commissioner,77 T.C. 1221, 1237 (1981). Moreover, it is well established that the substance of a transaction, rather than its form, governs for tax purposes. Commissioner v. Court Holding Co.,324 U.S. 331, 334 (1945); Grodt & McKay Realty, Inc. v. Commissioner,supra at 1236. "In the field of taxation, administrators of the laws, and the courts, are concerned with substance and realities, and formal written documents are not rigidly binding." Helvering v. Lazarus & Co.,308 U.S. 252, 255 (1939). The record establishes that AVL, Wyoming, and Wisconsin were the developers of their respective projects. *328 As such, they bore all costs associated with developing the apartment buildings and selling the mutual ownership contracts. They deducted these costs on their Federal income tax returns for the years in question. They also made monthly payments on the wrap notes and deducted the amounts of these payments on their Federal income tax returns or returns of income. In addition, they collected and kept all rents, cash downpayments, and collateral personal notes that were paid with respect to the projects, and if they had not transferred the wrap notes to Co-op, they would have received the promissory notes that were given by the purchasers of the mutual ownership contracts. On these facts, there is no doubt that, during the years in issue, AVL, Wyoming, and Wisconsin reaped the benefits and bore the burdens associated with the ownership of Fairfax West, Chancellery Co-op, and Wisconsin Apartments, respectively, and therefore no doubt that they must be treated for tax purposes as the respective owners of these properties during the years in issue. [20] It follows that the income from the sales of the Fairfax West mutual ownership contracts during 1973 and 1974 is attributable to AVL; *329 that the income from the sales of the Chancellery Co-op mutual ownership contracts during 1973 and 1974 is attributable to Wyoming; and that the income from the sales of the Wisconsin Apartments mutual ownership contracts during 1975 is attributable to Wisconsin. Secs. 61(a), 1001(b). [21] *330 Petitioners' contention that the mutual ownership contracts were sold on the installment method under section 453 is not supported by the record. During the years in issue, the installment method of reporting income could not be used unless an election to use the method appeared on the taxpayer's tax return. Sec. 1.453-8(b), Income Tax Regs. No such election appears on the Federal income tax returns or returns of income of any of the entities and individuals involved in the Fairfax West, Chancellery Co-op, and Wisconsin Apartments transactions for the years in issue. [22] *331 *332 We also find no merit in petitioners' assertion that the promissory notes that were given by the purchasers of the mutual ownership contracts did not have fair market values equal to their face amounts. Petitioners have not shown that the promissory notes, which were secured by the mutual ownership contracts and carried interest rates of approximately 8 percent per annum, did not have fair market values equal to their face amounts. More importantly, AVL, Wyoming, and Wisconsin were all accrual basis taxpayers, and -- an accrual basis taxpayer does not treat an unconditional right to receive money as property received, but rather as money received to the full extent of the face value of the right. * * * The fact that there is always the possibility that a purchaser or debtor may default in his obligation is not sufficient to defer the accruing of income that has been earned. * * * [First Savings and Loan Association v. Commissioner,40 T.C. 474, 487 (1963). Fn. ref. and citations omitted.] We hold that AVL, Wyoming, and Wisconsin must be treated for tax purposes as the respective owners of Fairfax *333 West, Chancellery Co-op, and Wisconsin Apartments during the years in issue. It follows that (1) the income from the sales of the 72 Fairfax West mutual ownership contracts in 1973 and 1974 (consisting of cash, collateral personal notes, and 72 promissory notes) is attributable to AVL; (2) the income from the sales of the nine Chancellery Co-op mutual ownership contracts in 1973 and 1974 (consisting of cash, other property, and nine promissory notes) is attributable to Wyoming; and (3) the income from the sales of the 32 Wisconsin Apartments mutual ownership contracts in 1975 (consisting of cash, collateral personal notes, and 32 promissory notes) is attributable to Wisconsin. [23]
2. Constructive *334 Distributions
We must also decide (1) whether Aleksandrs received from AVL in 1973 a constructive distribution of property with a fair market value of $396,000; and (2) whether Aleksandrs received from Wisconsin in 1974 a constructive distribution of property with a fair market value of $200,000. Respondent bears the burden of proof with respect to the first issue, having raised it for the first time in an amended answer, and petitioners bear the burden of proof with respect to the second issue. Rule 142(a); Welch v. Helvering,290 U.S. 111, 115 (1933); Gefen v. Commissioner,87 T.C. 1471, 1488 (1986). Section 301(c)(1) provides that a distribution of property made by a corporation to a shareholder with respect to its stock shall be included, to the extent that it is a dividend, in the gross income of the shareholder. Section 316(a) defines the term "dividends" as any distribution of property made by a corporation to its shareholders out of its accumulated or current earnings and profits. No formal dividend declaration need be made for a distribution to be taxable as a dividend. Yelencsics v. Commissioner,74 T.C. 1513, 1529 (1980). That portion of a distribution which is not *335 a dividend (that is, the portion of the distribution that is in excess of the corporation's earnings and profits) is applied against and reduces the shareholder's basis in his stock, and any amount in excess of basis is treated as a sale or exchange of property. Sec. 301(c)(2), (3). In the case of an individual distributee, the amount of a distribution is the fair market value of the property received. Sec. 301(b)(1)(A). It is well established that a distribution of property from a corporation need not be to a shareholder to be taxable to the shareholder under section 301(c); the distribution need only be for the shareholder's benefit. Cirelli v. Commissioner,82 T.C. 335, 351 (1984). Moreover, a transfer of property between two corporations may constitute a distribution to an individual who has an ownership interest in both corporations. Commissioner v. Makransky,321 F.2d 598, 601-602 (3d Cir. 1963), affg. 36 T.C. 446 (1961); Rapid Electric Co. v. Commissioner,61 T.C. 232, 239 (1973). Respondent argues that Aleksandrs received from AVL in 1973 a constructive distribution of property with a fair market value of $396,000, based on Aleksandrs' receipt in that year of the 396 *336 class A units of Co-op valued at $1,000 per unit. Respondent also argues that Aleksandrs received from Wisconsin in 1974 a constructive distribution of property with a fair market value of $200,000, based on RDM's receipt in that year of 200 class A units of Co-op valued at $1,000 per unit. With respect to Aleksandrs' receipt of the 396 class A units of Co-op in 1973, petitioners argue that the units "had a face value, not a real value, of $1,000.00 per [unit]," and that the units "were not taxable income until [Aleksandrs] disposed of them for value." [24] *337 With respect to RDM's receipt of the 200 class A units of Co-op in 1974, petitioners argue that "the 200 [units] of Co-op went to RDM," and the "entire record does not contain any evidence showing that the 200 [units] were transferred by RDM to" Aleksandrs. On the record before us, it is *338 clear that AVL transferred or distributed property, the Fairfax West wrap note, to Co-op solely for Aleksandrs' benefit. The transfer did not benefit AVL, but resulted in Aleksandrs receiving, in 1973, 396 class A units of Co-op valued at $1,000 per unit. [25] *339 Aleksandrs was AVL's only shareholder in 1973. Accordingly, we hold that Aleksandrs received from AVL in 1973 a distribution of property within the meaning of section 301 with a fair market value of $396,000. Petitioners' argument that Co-op's class A units had no value in 1973 is not supported by the record. The parties have stipulated that the units were valued at $1,000 per unit. Moreover, Co-op treated the units as having a fair market value of $1,000 per unit when it included $396,000 in its basis in the Fairfax West wrap note. We also note that in 1973 each class A limited partner of Co-op, including Aleksandrs, received, and under the partnership agreement was entitled to receive, distributions on their units equal to 10 percent of the face value of the units. Other than Aleksandrs' uncorroborated testimony, which we find not to be credible, petitioners offered no evidence that supports their contention that the class A units of Co-op did not have a fair market value equal to their stipulated value of $1,000 per unit. On the record before us, we find that the class *340 A units of Co-op had a fair market value equal to their stipulated value of $1,000 per unit. [26] The record also establishes that Aleksandrs received from Wisconsin in 1974 a constructive distribution of property valued at $200,000. Wisconsin, by transferring the Wisconsin Apartments wrap note to Co-op via 2720 Ltd. and RDM, indirectly transferred property (200 class A units of Co-op) to RDM. Aleksandrs owned or controlled all of the entities involved in the transfer of the Wisconsin Apartments wrap note to Co-op. The transfer *341 of the wrap note from Wisconsin to Co-op, in exchange for RDM receiving the 200 class A units of Co-op, did not benefit Wisconsin. Moreover, since all of the entities involved in the transfer of the wrap note to Co-op were either owned or controlled by Aleksandrs, it is safe to assume that Wisconsin's transfer of the wrap note to Co-op, in exchange for Co-op's transfer of the 200 class A units of Co-op to RDM, was for the benefit of Aleksandrs. We have already held that the class A units of Co-op had a fair market value equal to their stipulated value of $1,000 per unit. We therefore hold that Aleksandrs received from Wisconsin in 1974 a distribution of property within the meaning of section 301 with a fair market value of $200,000. [27] *342 3. Pleasant Hill
With respect to the Pleasant Hill transaction, the primary issue for decision is whether Pleasant Hill is entitled to claim losses in connection with the development of the Pleasant Hill Road Apartments (the Apartments). [28] Respondent bears the burden of proof with respect to this issue, having raised it for the first time in his trial memorandum. Rule 142(a); see Florists' Transworld Delivery Association v. Commissioner,67 T.C. 333, 347-348 (1976). Respondent contends that Co-op, and not Pleasant Hill, owned the Apartments during the years in question. He therefore asserts that Pleasant Hill is not entitled to claim any losses with respect to the Apartments during those *343 years. Petitioner contends that Co-op acted only as the nominee of Pleasant Hill with respect to the Apartments, and therefore that Pleasant Hill is entitled to claim the losses arising from the Apartments during the years in question. For the reasons set forth below, we find for respondent on this issue. The record clearly establishes that Pleasant Hill was neither the legal nor the beneficial owner of the Apartments during the years in question. Co-op held legal title to the Apartments. On March 1, 1973, Co-op took title to the Apartments for a cash downpayment of $134,614.61, and assumed the existing mortgage. Co-op borrowed $231,758 from NMC in order to pay the cash downpayment and cover the costs of converting the units to condominiums. The NMC loan was guaranteed by AVL, Aleksandrs, and Aleksandrs' wife, Cathie, and was ultimately paid, in January of 1975, by AVL, LVACC and VLAAC. In 1975, LVACC and VLAAC were not partners of Pleasant Hill. When Decatur foreclosed on the Apartments in 1974, it was AVL, not Pleasant Hill or its limited partners, that bore the bulk of the economic loss. Moreover, there is no documentary evidence in the record, other than a series of book *344 entries by Aleksandrs' accountant, that Co-op was acting as the nominee of Pleasant Hill with respect to the Apartments. On these facts, we conclude that Co-op, and not Pleasant Hill, was the legal and beneficial owner of the Apartments during the years in question. It follows that Pleasant Hill is not entitled to claim any losses with respect to the Apartments during those years. 4. Sundown
With respect to Sundown, the issues for decision are (1) whether Aleksandrs is entitled to deduct a partnership loss from Sundown in 1973, and (2) whether respondent properly disallowed losses claimed by Sundown in 1974 and 1975 in the amounts of $744,664 and $708,553, respectively. Petitioners bear the burden of proof with respect to these issues. Rule 142(a); Welch v. Helvering,290 U.S. 111, 115 (1933). Respondent's argument with respect to the first issue is that Aleksandrs cannot claim a partnership loss from Sundown in 1973 because Aleksandrs was never a partner of Sundown. Petitioners do not dispute that Aleksandrs was never a partner of Sundown. Instead, they argue that Aleksandrs is entitled to deduct AVL's 1973 partnership loss from Sundown by virtue of the agreement between Aleksandrs *345 and AVL that entitled Aleksandrs to the first $50,000 of tax loss attributable to AVL from Sundown. Petitioners also argue that there was a partnership consisting of Aleksandrs and AVL as partners, which Aleksandrs characterized at trial as "Sundown No. 2," through which, petitioners contend, Aleksandrs was entitled to claim AVL's partnership loss from Sundown. We find for respondent on this issue. The agreement between Aleksandrs and AVL that entitled Aleksandrs to the first $50,000 of tax loss attributable to AVL from Sundown was not a bona fide arm's-length agreement. Aleksandrs was the president of AVL and owned all of its stock in 1973. Moreover, we perceive no business purpose that was served by the agreement. In essence, Aleksandrs simply agreed with himself to assign to himself a tax loss that was properly attributable to AVL. We decline to give effect to such an agreement. In addition, the record does not support petitioners' contention, which was raised for the first time at trial, that there was a partnership other than Sundown through which Aleksandrs was entitled to claim AVL's loss from Sundown. In support of their contention that such a partnership existed, petitioners *346 offered at trial a purported 1973 partnership return for a purported "A.V. Laurins & Co., Inc. and Aleksandrs V. Laurins" partnership. The purported return is undated, unsigned, reflects no employer identification number, and the only entry on the entire return is a loss of $46,013.56. Aleksandrs testified at trial that the purported return was filed in the spring of 1974. We note, however, that the purported return is on a 1974 form with a typed-in date of 1973, and we doubt that the 1974 forms were available in the spring of 1974. In addition, an analysis of the K-1 forms attached to the purported return shows a total inconsistency between the purported return and the other stipulated returns. The purported return has three K-1 forms attached. Two of the K-1's are on 1974 forms with the year 1973 typed in, and the third is on a 1973 form. The two K-1's on the 1974 form are those associated with the purported "A.V. Laurins and Company, Inc. and Aleksandrs V. Laurins" partnership. One of these forms shows Aleksandrs as having a $46,013.56 loss from the purported partnership, and the other shows AVL as having no income or loss from the purported partnership. However, the third *347 K-1 attached to the purported return (on the 1973 form) purports to be that associated with the Sundown partnership, with Aleksandrs reflected as the partner of Sundown, and showing Aleksandrs as having a loss from Sundown in the amount of $46,013.56. In other words, the K-1 forms attached to the purported return are themselves inconsistent. The inconsistencies carry over to Aleksandrs' 1973 individual tax return. Aleksandrs included K-1 forms from the Pleasant Hill and Co-op partnerships with his 1973 Federal income tax return. Aleksandrs included no K-1 form either from the Sundown partnership or the purported "A.V. Laurins and Company, Inc. and Aleksandrs V. Laurins" partnership with his 1973 tax return. Moreover, despite Aleksandrs' contention at trial that the loss reflected on his 1973 tax return resulted from the purported "A.V. Laurins and Company, Inc. and Aleksandrs V. Laurins" partnership, Aleksandrs' 1973 tax return reflects the $46,013.56 loss as arising from his partnership interest in Sundown. The inconsistencies continue when we examine the AVL corporate return for 1973. Again, the AVL corporate return includes K-1 forms from Pleasant Hill and Co-op. However, the *348 AVL corporate return for 1973 includes no K-1 form for either Sundown or the purported "A.V. Laurins and Company, Inc. and Aleksandrs V. Laurins" partnership. Finally, Sundown's partnership return for 1973 includes a K-1 form showing AVL as a partner, with the $46,013.56 tax loss attributable to AVL. The AVL K-1 form associated with the filed Sundown 1973 partnership return is the exact same document as the K-1 form attached to the purported "A.V. Laurins and Company, Inc. and Aleksandrs V. Laurins" partnership return but with Aleksandrs' name as the partner covered over and replaced with AVL's name. We conclude that the purported "A.V. Laurins and Company, Inc. and Aleksandrs V. Laurins" partnership return is a fictitious document. We also conclude that, since Aleksandrs was never a partner of Sundown, he is not entitled to claim a loss from Sundown on his 1973 Federal income tax return. Respondent disallowed the following deductions reported on Sundown's 1974 partnership return: 1. Interest expense
$465,064
2. Advertising
[29] 70,000
3. Sales expense
15,716
4. Legal fees
4,607
5. Developers' overhead
120,000
6. Permanent lenders
commitment
7,333
7. Security system
2,500
8. Electrical
7,741
9. Depreciation
51,703
Total
$744,664
*349 The $465,064 interest expense represents interest that was accrued and added to the principal of the FMI loan in 1974. Respondent argues that this interest is not deductible by Sundown in 1974 because Sundown did not "pay" the interest in 1974. Petitioners concede that the $465,064 interest expense was attributable to the FMI loan and was accrued and added to the principal of the loan in 1974. Nevertheless, they argue that this accrued interest was properly deducted by Sundown in 1974. We find for respondent on this issue. Sundown reported its income and expenses on the cash method of accounting. For cash basis taxpayers, section 163(a) permits a deduction for interest "paid" within the taxable year. A cash basis taxpayer "pays" interest only when he pays cash or its equivalent to the lender, and giving a taxpayer's note is not the equivalent of paying cash. Helvering v. Price,309 U.S. 409, 413 (1940). In this case, Sundown clearly did not pay the interest in question in 1974. The interest was simply accrued and added to the principal of the FMI loan. Accordingly, Sundown *350 is not entitled to deduct the claimed $465,064 interest expense in 1974. With respect to the other deductions reported on Sundown's 1974 partnership return and disallowed by respondent, petitioners simply assert that the "expenses were paid and it is submitted that such expenses were deductible under Code section 162(a)." Petitioners bear the burden of establishing that respondent's disallowance of these deductions was in error, and a simple assertion that the expenses were paid is insufficient to establish that they are deductible under section 162. Accordingly, we sustain respondent's disallowance of these deductions. Respondent disallowed the following deductions reported on Sundown's 1975 partnership return: 1. Interest expense
$610,053
2. Legal fees
5,432
3. Depreciation
74,931
4. Repairs and maintenance
18,137
Total
$708,553
Respondent concedes that $140,850 of the $610,053 interest expense is deductible, but maintains that the rest represents accrued interest that was added to the principal of the FMI loan in 1975, and is therefore not deductible in 1975 by Sundown. Other than to assert on brief that "the interest deduction in the amount of $610,053.00 was proper," petitioners have *351 failed to address the deductibility of the items in question. Respondent's determinations in the notice of deficiency are presumptively correct, and petitioners bear the burden of proving them in error. Rule 142(a); Welch v. Helvering,290 U.S. 111, 115 (1933). Petitioners have failed to carry that burden. Accordingly, except to the extent of respondent's $140,850 concession, we sustain respondent's disallowance of Sundown's claimed 1975 deductions. 5. CWI
With respect to petitioner Consolidated Western Investors, Inc. (CWI), and its subsidiaries, we must decide (1) whether Aries Information Systems (AIS) has additional income in 1975 in the amount of $36,870 as the result of receiving prepaid cash proceeds pursuant to long-term service contracts; (2) whether respondent properly disallowed a $25,000 management and consulting expense deduction claimed by Real Estate, Inc., in 1975; (3) whether RDM is entitled to a $20,000 interest expense deduction arising from a debt to 2720 Ltd.; (4) whether MMB is entitled to a bad debt deduction of $34,326.79 in 1975; (5) whether EFS Company is entitled to claim a loss on the CWI 1975 consolidated Federal income tax return that arose during *352 a period prior to its affiliation with CWI; (6) whether MMB has ordinary income in 1975 in the amount of $181,436 resulting from the loss recaptured upon the worthlessness of EFS Company's stock; (7) whether CWI is liable for an addition to tax pursuant to section 6651(a)(1) for the taxable year 1975; and (8) whether CWI is liable for an addition to tax for negligence pursuant to section 6653(a) for the taxable year 1975. (a) AIS Contract Income
Respondent originally determined that AIS had additional income in 1975 from its long-term service contracts in the amount of $51,536. On brief, respondent concedes that only $36,870 of the $51,536 is includable in AIS's income for 1975. Respondent contends, citing section 446(b), [30] *353 that advance payments received by an accrual basis taxpayer under an agreement for the performance of future services may be deferred until the time of performance, provided the services are to be performed before the end of the first succeeding taxable year. Respondent then argues that since the AIS service contracts extended far beyond the end of 1976, the cash receipts in question are includable in the income of AIS in the year received, 1975. Petitioners make no argument on brief with respect to this issue and, other than Aleksandrs' testimony at trial that he believed AIS had properly reported the income from the service contracts, petitioners offered no evidence with respect to this issue. Respondent's determination in the notice of deficiency is presumed to be correct, and petitioners bear the burden of proving it in error. Rule 142(a); Welch v. Helvering,290 U.S. 111, 115 (1933). Petitioners have failed to carry that burden. Accordingly, respondent's determination with respect to the AIS contract income is sustained. (b) Real Estate Inc.'s Management and Consulting Expense[31] On its 1975 Federal income tax return, Real Estate, Inc., claimed a $25,000 deduction for a purported management and consulting *354 expense. Respondent disallowed this deduction based on his determination that Real Estate, Inc., had failed to establish that the expense was ordinary and necessary and expended for the purpose designated. Petitioners offered no evidence at trial to substantiate that the purported expense was ordinary and necessary. In addition, petitioners make no argument on brief with respect to this issue. Respondent's determination in the notice of deficiency is presumed to be correct, and petitioners bear the burden of proving it in error. Rule 142(a); Welch v. Helvering,supra at 115. Petitioners have failed to carry that burden. Accordingly, we sustain respondent's determination that Real Estate, Inc., is not entitled to deduct the claimed $25,000 management and consulting expense in 1975. (c) RDM's Interest Expense
In 1975, RDM claimed a $20,000 interest expense. Respondent disallowed the deduction. Petitioners offered no evidence at trial and make no arguments on brief with respect to this adjustment. As we have so often noted, respondent's determination in the notice of deficiency is presumed to be correct, and petitioners bear the burden of proving it in error. Rule 142(a); Welch v. Helvering,supra at 115. *355 Petitioners have failed to carry that burden. Accordingly, respondent's determination that RDM is not entitled to deduct the claimed $20,000 interest expense in 1975 is sustained. (d) MMB Bad Debt Deduction
MMB claimed a bad debt deduction in 1975 in the amount of $34,326.79. Respondent disallowed the deduction. Petitioners offered no evidence at trial and make no arguments on brief with respect to this adjustment. Respondent's determination in the notice of deficiency is presumptively correct, and petitioners bear the burden of proving it in error. Rule 142(a); Welch v. Helvering,supra at 115. Petitioners have failed to carry that burden. Accordingly, respondent's determination that MMB is not entitled to a bad debt deduction in the amount of $34,326.78 in 1975 is sustained. (e) EFS Company -- Loss Attributable to Period Prior to Affiliation With CWI
EFS Company reported a loss on the CWI 1975 consolidated Federal income tax return for the period February 28, 1975, to December 31, 1975, in the amount of $242,964. Respondent disallowed $61,528 of this loss, stating in the notice of deficiency that "since E.F. Shelley & Co., Inc. was not a member of the affiliated group until *356 4-1-75, the loss of $61,528.00 incurred during the period 3-1-75 to 3-31-75 is eliminated from the return." Respondent's determination in the notice of deficiency is presumptively correct, and petitioners bear the burden of proving it in error. Rule 142(a); Welch v. Helvering,supra at 115. Petitioners offered no evidence at trial and make no arguments on brief to rebut respondent's determination that $61,528 of the claimed $242,964 loss is not deductible. Accordingly, petitioners have failed to carry their burden of proof with respect to this issue. We therefore sustain respondent's determination that $61,528 of the claimed $242,964 loss is not deductible on CWI's 1975 consolidated Federal income tax return. (f) MMB Excess Loss Account
Respondent originally determined that MMB had ordinary income of $164,628 in 1975 from the excess loss recaptured upon the worthlessness of the EFS Company stock. Respondent also originally determined that EFS Company was not entitled to a $16,808 loss in 1975 on the sale of certain assets. On brief, respondent concedes the $16,808 adjustment, and now contends that MMB had ordinary income in 1975 in the amount of $181,436 ($164,628 plus $16,808) *357 from the loss recaptured upon the worthlessness of the EFS Company stock. In terms of tax due, the result of the $16,808 concession coupled with the $16,808 increase in income is a wash, resulting in no increased deficiency for CWI. Petitioners concede that MMB had ordinary income in 1975 in the amount of $181,436, resulting from the excess loss recaptured upon the worthlessness of the EFS Company stock. Petitioners argue, however, that "[i]t is clear that the operating loss of EFS Company in 1975 in the amount of $181,436.00 and the ordinary income in 1975 to MMB of $181,436.00 from its excess loss account for EFS Company worthless stock offset each other on the consolidated tax return of CWI for 1975," and therefore that "CWI as petitioner, did not have $181,436.00 in 1975 taxable as additional income in 1975 * * *." We note that petitioners' argument would have merit if MMB had reported on CWI's 1975 consolidated Federal income tax return ordinary income in the amount of $181,436, resulting from the loss recaptured upon the worthlessness of the EFS Company stock. The record reflects, however, that MMB did not report this income on CWI's 1975 consolidated Federal income tax return. *358 Accordingly, since petitioners concede that MMB had ordinary income in 1975 in the amount of $181,436 resulting from the loss recaptured upon the worthlessness of the EFS Company stock, and since the record reflects that MMB did not report this income on CWI's 1975 consolidated Federal income tax return, we find that MMB has additional ordinary income in 1975 in the amount of $181,436. (g) Additions to Tax
Respondent determined that CWI was liable for an addition to tax for negligence pursuant to section 6653(a) in the amount of $9,818 for the taxable year 1975. Respondent also determined that CWI was liable for an addition to tax for failure to file a timely return pursuant to section 6651(a)(1) in the amount of $19,636 for the taxable year 1975. [32] These determinations are presumptively correct, and petitioners bear the burden of proving them in error. Rule 142(a); Welch v. Helvering,supra at 115; Leahy v. Commissioner,87 T.C. 56, 73 (1986); Tomburello v. Commissioner,86 T.C. 540, 547 (1986), on appeal (9th Cir., Nov. 10, 1986). Petitioners have failed to carry that burden because they offered no evidence at trial and no arguments on brief with respect to these determinations. *359 Accordingly, the determinations are sustained. 6. Co-op
Respondent determined that (1) Co-op had additional income of $5,092 in 1973 and $2,671.34 in 1974 as the result of its receipt of principal payments on certain notes; (2) Co-op had additional income of $54,720.83 in 1974 as a result of the sale of certain notes; (3) Co-op had additional note discount income in 1973 and 1974 in the amounts of $10,005 and $29,833.12, respectively; (4) Co-op was not entitled to deduct $6,351.74 as a note discount expense in 1974; [33] and (5) Co-op improperly reported its note discount income in 1975.[34] *361 Petitioners make no arguments on brief and, other than some testimony from Aleksandrs that he believed Co-op had properly reported its income during the years in question, offered no evidence at trial that these determinations *360 are in error. Respondent's determinations in his notice of deficiency are presumptively correct, and petitioners bear the burden of proving them in error. Rule 142(a); Welch v. Helvering,supra at 115. Petitioners have failed to carry that burden. Accordingly, the determinations are sustained. 7. The Harvey Marcus Note
The record establishes that Aleksandrs received 72 class A units of Co-op in 1973 valued at $1,000 per unit as the result of AVL transferring the Harvey Marcus note to Co-op. We have already found that the fair market value of a class A unit of Co-op in 1973 was equal to its stipulated value of $1,000 per unit. Aleksandrs failed to include in income on his 1973 Federal income tax return the value of the 72 class A units of Co-op. At trial, Aleksandrs offered as evidence a copy of a purported version of his 1973 Federal income tax return that reflected the receipt of the $72,000 partnership *362 interest in Co-op, which he claimed to have reported on the installment method under section 453. We have already found the purported return to be a fictitious document, and the stipulated version of the 1973 return, which does not report the receipt of the 72 class A units of Co-op, to be the true and correct version of Aleksandrs' 1973 Federal income tax return. Petitioners offer no reason, and we perceive no reason, why the value of the 72 class A units of Co-op is not includable in Aleksandrs' income in 1973. Accordingly, based on Aleksandrs' receipt of the 72 class A units of Co-op in 1973, we hold that Aleksandrs received in 1973 unreported income in the amount of $72,000. See sec. 61(a). 8. Miscellaneous Adjustments
Respondent determined that (1) Aleksandrs was not entitled to deduct a claimed syndication expense in the amount of $37,221 in 1973; (2) Aleksandrs was not entitled to deduct $988 of a claimed $1,988 short-term capital loss in 1973; (3) Aleksandrs had dividend income in 1974 and 1975 in the amounts of $10,232 and $92, respectively; (4) Aleksandrs was not entitled to deduct a claimed $7,060 loss from gold futures trading in 1975; (5) Aleksandrs was not entitled *363 to deduct in 1974 a transfer tax in the amount of $1,547 that was paid in connection with his purchase of a personal residence; (6) AVL was not entitled to deduct a claimed note discount expense in the amount of $6,365 in 1974; (7) AVL was not entitled to deduct a claimed debt reduction expense in the amount of $20,339 in 1974; (8) Real Estate, Inc., was not entitled to deduct a claimed investment reserve expense in the amount of $15,000 in 1974; (9) Charlene was not entitled to deduct claimed charitable contributions in the amount of $1,200 in 1974; (10) Charlene was liable for an addition to tax for negligence pursuant to section 6653(a) for the taxable years 1974 and 1975 in the amounts of $111.59 and $121.57, respectively; (11) LAV Shell was liable for an addition to tax for negligence pursuant to section 6653(a) for the taxable year 1974 in the amount of $13,475; [35] and (12) Real Estate, Inc., was liable for an addition to tax for negligence pursuant to section 6653(a) for the taxable year 1975 in the amount of $699.95. [36] *365 These determinations are presumptively correct, and petitioners bear the burden of proving them in error. Rule 142(a); Welch v. Helvering,supra at 115. Petitioners *364 have offered no evidence or arguments with respect to these determinations. Accordingly, the determinations are sustained. 9. Fraud
The final issue for decision in this case is whether Aleksandrs is liable for an addition to tax for fraud under section 6653(b) for the taxable years 1973, 1974, and 1975. Section 6653(b) imposes an addition to tax if any part of an underpayment of tax is due to fraud. Respondent bears the burden of proving fraud by clear and convincing evidence. Section 7454(a); Rule 142(b); Otsuki v. Commissioner,53 T.C. 96, 105 (1969). Respondent must show that the taxpayer intended to evade taxes which he knew or believed that he owed by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. Webb v. Commissioner,394 F.2d 366, 377-378 (5th Cir. 1968), affg. a Memorandum Opinion of this Court. The elements to *366 be established are (1) an underpayment of tax, [37] and (2) that some part of the underpayment was due to fraud. Plunkett v. Commissioner,465 F.2d 299, 303 (7th Cir. 1972), affg. a Memorandum Opinion of this Court. By virtue of our other findings in this case, it is clear that there was an underpayment of tax by Aleksandrs in each of the years in question. Thus, the question to be answered is whether all or part of the underpayment in each of these years was due to fraud. The existence of fraud is a factual question to be determined by an examination of the entire record. Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud will never be presumed. Beaver v. Commissioner,55 T.C. 85, 92 (1970). Fraud may, however, be proved by circumstantial evidence because direct proof of the taxpayer's intent is rarely available, and the taxpayer's entire course of conduct may establish the requisite fraudulent intent. Stone v. Commissioner,56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner,supra at 105-106. *367 "Although mere understatement of income standing alone is not sufficient to prove fraud, the consistent and substantial understatement of income is, by itself, strong evidence of fraud." Marcus v. Commissioner,70 T.C. 562, 577 (1978), affd. without published opinion 621 F.2d 439 (5th Cir. 1980). In the instant case, it is clear that there was a pattern of consistent and substantial underreporting of income by Aleksandrs for the 3 years involved. Aleksandrs reported taxable income of $1,103.51, $3,728, and $613 in 1973, 1974, and 1975, respectively. In fact, Aleksandrs had additional income in 1973 in the amount of $396,000 (resulting from AVL's transfer of the Fairfax West wrap note to Co-op and Co-op's transfer of 396 class A units of Co-op to Aleksandrs) and $72,000 (resulting from AVL's transfer of the Harvey Marcus note to Co-op and Co-op's transfer of 72 class A units of Co-op to Aleksandrs), which was not reported on his filed 1973 Federal income tax return. In addition, Aleksandrs claimed a $46,013.56 loss from a partnership, Sundown, of which he was never a partner. Also, in 1973, 1974, and 1975, Aleksandrs claimed losses totaling approximately $113,000 from Pleasant Hill *368 when he never contributed money or property to the partnership. In view of Aleksandrs' background (the fact that he was a tax expert and a former employee of respondent), we find that Aleksandrs must have known that he was not entitled to claim the losses from Pleasant Hill and the loss from Sundown, and that he knew that he had $468,000 of unreported income ($396,000 plus $72,000) in 1973. We therefore conclude that Aleksandrs intended to evade taxes which he knew that he owed. Moreover, Aleksandrs' introduction at trial of the fictitious 1973 individual tax return, the fictitious 1972 partnership return for Wyoming, and the fictitious 1973 partnership return for the purported "A.V. Laurins and Company, Inc. and Aleksandrs V. Laurins" partnership, has demonstrated to this Court that Aleksandrs is fully capable of fraud. Aleksandrs' whole course of conduct in these cases, including that at trial, is clear and convincing evidence that his underpayments of tax for 1973, 1974, and 1975 were due to fraud. It follows that Aleksandrs is liable for the addition to tax for fraud pursuant to section 6653(b) for each of the years in issue. [38] *369 *370 Decisions will be entered under Rule 155.
[39]
APPENDIX A Docket No.
Petitioner
Year
Deficiency
7361-77
James G. Norman
1973
$4,589.00
7362-77
Lawrence C. &
Melanie F. Nussdorf
1973
3,620.78
8398-77
Janis Laurins
1973
559.00
9330-78
1974
600.00
6465-79
1975
661.17
8399-77
Charlene Baden
1973
1,773.81
9392-79
1974
2,231.84
1975
2,431.41
9052-77
A.V. Laurins &
Co., Inc.
1973
* *371 146,689.30
9053-77
Aleksandrs V. & Cathie
1973
* 393,326.88
6464-79
Laurins
1974
336,003.46
1975
22,383.48
6462-79
LAV Shell Co., Inc.
1974
* 281,994.10
and Subsidiaries
6463-79
Consolidated Western
Investors, Inc.
1975
* 237,100.47
6466-79
Real Estate Equity
Management, Inc.
1975
* 97,746.96
Additions to Tax Under Sections
Docket No.
6653(b)
6653(a)
6651(a)(1)
7361-77
7362-77
8398-77
9330-78 ** $60.00
6465-79
8399-77
9392-79
$111.59
121.57
9052-77
9053-77
* $196,663.44
6464-79
* 168,001.73
16,800.17
* 22,383.48
1,119.17
6462-79
* 14,099.70
6463-79
* 11,857.00
* 23,715.00
6466-79
* 4,887.35
APPENDIX B Residence or
Principal Place
Office of IRS Where
Of Business When
Federal Income Tax
Docket No.
Petitioner
Petition Filed
Returns Were Filed
7361-77
James G. Norman
Adelphi, Md.
Philadelphia, Pa.
7362-77
Lawrence C. &
Washington, D.C.
Holtsville, N.Y.
Melanie F. Nussdorf
8398-77
Janis Laurins
Adelphi, Md.
Philadelphia, Pa.
9330-78
6465-79
8399-77
Charlene Baden
Gaithersburg, Md.
Philadelphia, Pa.
9392-79
9052-77
A.V. Laurins & Co.,
Chevy Chase, Md.
Philadelphia, Pa.
Inc.
9053-77
Aleksandrs V. & Cathie
San Francisco, Calif.
Philadelphia, Pa.
6464-79
Laurins
6462-79
LAV Shell Co., Inc.
Chevy Chase, Md.
Philadelphia, Pa.
and Subsidiaries
6463-79
Consolidated Western
Chevy Chase, Md.
Philadelphia, Pa.
Investors, Inc.
6466-79
Real Estate Equity
Chevy Chase, Md.
Philadelphia, Pa.
Management, Inc.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Lawrence C. Nussdorf and Melanie F. Nussdorf, docket No. 7362-77; Janis Laurins, docket Nos. 8398-77, 9330-78, 6465-79; Charlene Baden, docket Nos. 8399-77, 9392-79; A.V. Laurins & Co., Inc., docket No. 9052-77; Aleksandrs V. Laurins and Cathie Laurins, docket Nos. 9053-77, 6464-79; LAV Shell Co., Inc., and Subsidiaries, docket No. 6462-79; Consolidated Western Investors, Inc., docket No. 6463-79; and Real Estate Equity Management, Inc., docket No. 6466-79.↩
2. Unless otherwise indicated, all sections referred to are sections of the Internal Revenue Code of 1954, as amended and in effect during the years in issue, and all rules referred to are rules of the Tax Court Rules of Practice and Procedure.
3. AVL reported its income and expenses on the accrual method of accounting and used the calendar year as its taxable year. At all times relevant to this proceeding, Aleksandrs was the president of AVL. During 1973, Aleksandrs owned all of AVL's stock. During 1974, AVL was owned by petitioner LAV Shell Co., Inc., a holding company, which in turn was owned by Aleksandrs' 2-year-old daughter, Kimberly. During 1975, AVL was owned by LAV Shell Co., Inc.; LAV Shell was owned by petitioner Consolidated Western Investors, Inc.; and Aleksandrs' daughter Kimberly owned more than 80 percent of the stock of Consolidated Western Investors, Inc.↩
4. At all times relevant to this proceeding, Aleksandrs was the president of FWAO.↩
5. The purchaser of a mutual ownership contract was entitled to the perpetual use and enjoyment of a designated apartment unit in Fairfax West.↩
6. AVL was the general partner of Co-op in 1973 and part of 1974. Petitioner Real Estate Equity Management, Inc., became the general partner of Co-op at the end of 1974 and continued as the general partner into 1975. See section VII., infra.↩
7. There is a discrepancy of $6.00 that is not accounted for in the record.↩
8. In 1974, AVL's income and expenses were reported on the consolidated Federal income tax return of petitioner LAV Shell Co., Inc. AVL was not part of a consolidated group in 1973. See note 3, supra.↩
9. Wyoming sold mutual ownership contracts for seven apartment units in 1972, a year not before the Court. ↩
10. One purchaser did not execute a promissory note for his proportionate share of the wrap note but instead paid cash to satisfy the liability.
11. Lawrence C. Nussdorf was a limited partner in Wyoming in 1973. ↩
12. On brief, respondent claims that Wyoming understated its 1973 gross sales income from the Chancellery Co-op project in the amount of $264,450.56 (the total amount of the proceeds from the sales of the six mutual ownership contracts, $393,560, minus receipts reported by Wyoming in the amount of $129,109.44).↩
13. In 1975, Wisconsin reported its income and expenses on the consolidated Federal income tax return of petitioner Consolidated Western Investors, Inc.↩
14. In 1975, RDM's income and expenses were reported on the consolidated Federal income tax return of Consolidated Western Investors, Inc.↩
15. Respondent concedes that EFS Company is entitled to a loss of $16,808 on the sale of its assets and asserts, as a result, that MMB has ordinary income of $181,436 ($164,628 plus $16,808) from the recapture of the excess loss account.↩
16. Respondent has conceded that $7,135.10 of the claimed note discount expense is deductible, but maintains that $6,351.74 of the note discount expense is not deductible.↩
17. Respondent concedes that the $12,552.07 adjustment for additional note discount income should have been only $8,721, and thus the reduction in note discount income should have been $13,629.07 and not the $9,798 as originally determined.↩
18. Respondent concedes that if we find that the income from the sales of the Fairfax West mutual ownership contracts in 1973 and 1974 is attributable to AVL, Aleksandrs and Cathie do not have additional income from the Fairfax West project as determined by respondent in the notices of deficiency dated June 3, 1977, and February 16, 1979. 19. Respondent concedes that if we decide these issues in his favor, Co-op does not have additional note discount income as claimed by respondent in the amended answers in docket Nos. 9052-77, 6462-79, and 6466-79.↩
20. The parties have stipulated that AVL entered into the contract for the purchase of Fairfax West as the "nominee" of Aleksandrs. Based on the facts in the record, we do not believe that this characterization properly reflects the substance of AVL's role in the Fairfax West project. Moreover, we note that the stipulation appears to be a stipulation of law, and as such, we are not bound by it. Estate of DiMarco v. Commissioner,87 T.C. 653, 663↩ n.10 (1986). 21. Respondent proposes as a finding of fact and argues for the first time on brief that AVL did not report rental income from the Fairfax West project during 1973 and 1974. This is a new matter as to which respondent bears the burden of proof. Rule 142(a); see Gefen v. Commissioner,87 T.C. 1471, 1488 (1986). Petitioners argue that AVL reported the rental income from Fairfax West during 1973 and 1974, but that the rental income for 1973 was incorrectly reported as interest on AVL's 1973 Federal income tax return. On the record before us, we are unable to determine whether AVL reported the rental income from the Fairfax West project during 1973 and 1974. Accordingly, we find that respondent has failed to carry his burden of proof with respect to this issue.
22. At trial, petitioners offered as evidence a purported copy of Wyoming's 1972 partnership return that contains the following page: WYOMING ASSOCIATES Pursuant to Section 453 of Internal Revenue Code of 1963[sic], Wyoming Associates elects to report the following sale of assets on installment basis: Note Sale to Co-op Mortgage Investment Associates, covering the chancellery [sic] Cooperative Apartments, $200,000.00 Earnings are reported as ordinary income. The stipulated version of Wyoming's 1972 partnership return does not contain this page, and Theodore Shaughnessy, the revenue agent who was responsible for examining Wyoming's 1972 partnership return, testified that the 1972 partnership return that Wyoming filed with the Internal Revenue Service did not contain this page. As stated by petitioners' counsel, the purpose of offering the purported partnership return was to "put in evidence exhibits showing the pattern * * * on behalf of the Laurins enterprises." The purported partnership return is unsigned and is missing several pages. The stipulated version of Wyoming's 1972 partnership return is signed, appears to be complete, and does not contain any installment election pursuant to section 453. In view of Mr. Shaughnessy's testimony, and the fact that the purported copy of the 1972 partnership return is at variance with the stipulated version of the return, we find the stipulated version of Wyoming's 1972 partnership return to be the true and correct copy of the return that was filed with the Internal Revenue Service, and the purported return to be a fictitious document.
23. By virtue of determining that AVL, Wyoming, and Wisconsin had additional income from the sales of the mutual ownership contracts, respondent made numerous adjustments in his notices of deficiency to the costs and bases claimed by AVL, Wyoming, and Wisconsin with respect to the projects. These adjustments are presumptively correct, and petitioners bear the burden of proving them in error. Rule 142(a); Welch v. Helvering,290 U.S. 111, 115↩ (1933). Petitioners do not contest these adjustments.
24. At trial, Aleksandrs testified that he reported the receipt of the 396 class A units of Co-op on the installment method under section 453. In support of this testimony, he offered as evidence at trial a purported copy of his 1973 Federal income tax return that contains the following two pages: Page 1
A. V. LAURINS
SCHEDULE OF INCOME
1973
Taxable
Deferred
Total
Income from
Income
Income
Income
Co-op Mortgage, Fairfax
$396,000.00
$396,000.00 Co-op Mortgage, K Street
72,000.00
72,000.00 A. V. Laurins Prop.
$52,159.00 52,159.00 Sundown
(46,013.56)
(46,013.56)
Pleasant Hill
(24,912.03)
(24,912.03)
A. V. P. Beef
( 1,988.00)
( 1,988.00)
Salary
25,000.00 25,000.00 $ 4,245.41 $468,000.00
$472,245.41 Page 2
Aleksandrs V. &
Cathie Laurins
543 48 2581
213 46 0244
Pursuant to Section 453 of Internal Revenue Code of 1963[sic], Aleksandrs V. & Cathie Laurins elects [sic] to report the following sale of assets on installment basis: Note sale to Co-op Mortgage Investment Associates,
covering the Fairfax West Apartment Owners
Association, Inc.
396,000.00
Note Sale to Co-op Mortgage Investment Associates,
covering the Harvey Marcus K Street Apartments
$72,000.00
Earnings are reported as
ordinary income.
The stipulated version of Aleksandrs' 1973 Federal income tax return does not contain these two pages. Moreover, Patrick Nissley, the revenue agent who was responsible for examining Aleksandrs' 1973 Federal income tax return, testified that the 1973 return that Aleksandrs filed with the Internal Revenue Service did not contain these pages. In view of Mr. Nissley's testimony, and the fact that the purported copy of the 1973 return is at variance with the stipulated version of the return, we find the purported copy of the 1973 return to be a fictitious document, and its offer at trial to be an obvious and clumsy attempt by Aleksandrs to avoid the addition to tax for fraud.↩
25. The parties have stipulated that AVL and Aleksandrs construed the nominee agreement as entitling Aleksandrs to $475,771.95 on January 2, 1973, and that to satisfy this obligation, AVL transferred the wrap note to Co-op in exchange for Co-op's transfer of 396 class A units of Co-op to Aleksandrs. We note that this construction of the nominee agreement is contrary to its express terms. The nominee agreement did not provide that Aleksandrs was entitled to $475,771.95, or that AVL would transfer the wrap note to Co-op in exchange for Aleksandrs receiving a partnership interest in Co-op; rather, the agreement simply provided that Aleksandrs would receive the income from the sale of Fairfax West to FWAO. However, there was no income from the sale of Fairfax West to FWAO because NMC conveyed Fairfax West directly to FWAO. Accordingly, since AVL and Aleksandrs ignored the provisions of the nominee agreement in implementing the Fairfax West transaction, we do not find the agreement helpful in determining the substance of the transaction.
26. Aleksandrs testified that he was obligated to pay sums of money to third parties who had contributed capital to fund the Fairfax West project, that he distributed the 396 class A units of Co-op to these parties in satisfaction of the obligations, and that he reported income when he disposed of the units. The record does not support Aleksandrs' assertion that he reported income when he disposed of the 396 class A units of Co-op. However, even if the assertion were true, we fail to see how the reporting of income on the disposition of the units would justify Aleksandrs' failure to include in income in 1973 the fair market value of the 396 class A units of Co-op.↩
27. It is unclear from the record whether Aleksandrs actually owned stock in Wisconsin in 1974. Nevertheless, respondent determined in his notice of deficiency that Aleksandrs owned stock in Wisconsin in 1974 when he determined that Aleksandrs had received from Wisconsin in 1974 a distribution of property within the meaning of section 301. Respondent's determination in his notice of deficiency is presumptively correct, and petitioners bear the burden of proving it in error. Rule 142(a); Welch v. Helvering,290 U.S. 111, 115↩ (1933). Petitioners offered no evidence at trial that Aleksandrs did not own stock in Wisconsin in 1974.
28. An alternative issue raised by respondent is whether the limited partners of Pleasant Hill had sufficient bases in their partnership interests to permit them to deduct their distributive shares of Pleasant Hill's claimed losses. Because of our resolution of the primary issue, we need not address this alternative issue.↩
29. Respondent concedes on brief that $59,751.10 of the claimed $70,000 advertising expense is deductible.↩
30. Section 446(b) provides that if the taxpayer's method of accounting "does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary or his delegate, does clearly reflect income."
31. Real Estate, Inc., was not a subsidiary of CWI in 1975. Nevertheless, for convenience, we consider the issue relating to Real Estate, Inc.'s management and consulting expense here.↩
32. By amended answer in docket No. 6463-79, respondent sought an increased deficiency in CWI's Federal income tax for 1975 in the amount of $40,791, and corresponding increased additions to tax under sections 6651(a)(1) and 6653(a)↩ in the amounts of $4,079 and $2,039, respectively. On brief, respondent concedes the increased deficiency and corresponding increased additions to tax.
33. Respondent originally determined that Co-op was not entitled to deduct $13,486.84 as a note discount expense. On brief, respondent concedes that Co-op is entitled to deduct $7,135.10 of the claimed $13,486.84 expense, but continues to assert that $6,351.74 of the claimed expense is not deductible. ↩
34. Co-op reported total note discount income for 1975 in the amount of $86,575.93. Co-op reported half of this amount as long-term capital gain and half as ordinary income. Co-op claimed deductions in connection with the payoff of the Chancellery Co-op wrap note in 1975 totaling $65,638. Respondent disallowed the deductions and capitalized them. As a result, respondent reduced the original note discount income of $86,575.93 by the capitalized expense of $65,638, resulting in a net note discount income of $20,937.93. Respondent further determined that Co-op had additional note discount income of $12,552.07, for a total reportable income of $33,490. Respondent then determined that the note discount income was properly reportable as ordinary income, and not half capital gain, and reduced the note discount income reported as ordinary income by $9,798 ($43,288 minus $33,490) and eliminated the originally reported long-term capital gain. Respondent concedes that the $12,552.07 adjustment for note discount income should have been only $8,721, and thus that the reduction in note discount income should have been $13,629.07, and not the $9,798 as originally determined.
35. By amended answer in docket No. 6462-79, respondent sought an increased deficiency in income tax for LAV Shell for the taxable year 1974 in the amount of $12,499.10, and a corresponding increase in the addition to tax under section 6653(a)↩ in the amount of $624.70. Respondent concedes that if we find, as we have found, that AVL, Wyoming, and Wisconsin have additional gross sales income in the amounts determined by respondent from the Fairfax West, Chancellery Co-op, and Wisconsin Apartments projects, respectively, and that Aleksandrs has additional income in 1973 in the amount of $72,000, based on his receipt of the 72 units of Co-op, there is no increased deficiency and corresponding increased addition to tax as sought in the amended answer. 36. By amended answer in docket No. 6466-79, respondent sought an increased deficiency in income tax for Real Estate, Inc., for the taxable year 1975 in the amount of $83,747.96, and a corresponding increase in the addition to tax under section 6653(a) in the amount of $4,187.40. Respondent concedes that there is no increased deficiency or increased addition to tax as sought in the amended answer if we find, as we have found, that AVL, Wyoming, and Wisconsin have additional gross sales income in the amounts determined by respondent from the Fairfax West, Chancellery Co-op, and Wisconsin Apartments projects, respectively, and that Aleksandrs has additional income in 1973 in the amount of $72,000, based on his receipt in that year of the 72 class A units of Co-op.
37. As relevant to these cases, sec. 6653(c)(1) defines "underpayment" for purposes of sec. 6653↩ as a "deficiency" as defined in sec. 6211.
38. Petitioners argue, for the first time on brief, that Aleksandrs' wife, Cathie, is an "innocent spouse," within the meaning of section 6013(e). Petitioners bear the burden of proving that Cathie is entitled to the protection of section 6013(e). Lessinger v. Commissioner,85 T.C. 824, 838 (1985). Since there is no evidence in the record with respect to this issue, petitioners have failed to carry that burden, and we find that Cathie is not entitled to the protection of section 6013(e). This does not mean, however, that Cathie is liable for the addition to tax for fraud under section 6653(b). There is no evidence in the record that Cathie engaged in any fraudulent conduct. "In the case of a joint return under section 6013, * * * [section 6653(b)] shall not apply with respect to the tax of a spouse unless some part of the underpayment is due to the fraud of such spouse." Sec. 6653(b). However, Cathie is liable for the addition to tax for negligence pursuant to section 6653(a) as determined by respondent in the notice of deficiency dated February 16, 1979. This determination is presumptively correct, and petitioners bear the burden of proving it in error. Rule 142(a); Welch v. Helvering,supra at 115. Petitioners have failed to carry that burden because there is no evidence in the record that this determination is in error.
39. Respondent determined that AVL, LVACC, VLAAC, VALM, ALV Sales, and MMB were not entitled to net operating loss carryovers from 1974, based on his determination that these entities did not have net operating losses in 1974. Respondent's adjustments with respect to this issue depend solely on the concessions and our findings with respect to the other issues in these cases. Accordingly, this is an issue to be resolved in the computation under Rule 155.↩
*. Includes amounts claimed in amended answer. ** Respondent concedes this addition to tax.↩